## UNITED STATES v. HISS.

No. 78, Docket 21800.

United States Court of Appeals
Second Circuit.

Argued Oct. 13, 1950.

Decided Dec. 7, 1950.

See also 88 F.Supp. 559.

Beer, Richards, Lane & Haller, New York City (Robert M. Benjamin, Harold Rosenwald, Chester T. Lane, and Kenneth Simon, New York City, of counsel), for appellant.

Irving H. Saypol, U. S. Atty., for the Southern District of New York, New York City (Clark S. Ryan, Sp. Asst. to U. S. Atty., New York City, Thomas J. Donegan, Sp. Asst. to Atty. Gen., of counsel), for the United States.

Thomas F. Murphy, New York City, amicus curiae.

Before SWAN, AUGUSTUS N. HAND and CHASE, Circuit Judges.

CHASE, Circuit Judge.

On December 15, 1948, the appellant testified under oath as a witness before a grand jury of the United States sitting in the Southern District of New York that he had never, nor had his wife in his presence, turned over any documents of the State Department or of any other Government organization, or copies of such documents, to Whittaker Chambers or to any other unauthorized person. He also testified before the same grand jury on the same day that he thought he could definitely say that he did not see Mr. Chambers after January 1, 1937. This grand jury returned an indictment charging in count one that he committed the crime of perjury[1] when he testified as firstly above stated and in count two that he did when he testified as secondly above set forth. He was duly tried by jury twice, the jury at the first trial having failed to agree upon a verdict. At the second trial he was convicted on both counts and has appealed from the judgment and sentence thereon.

He relies for reversal upon the alleged insufficiency of the evidence as to both counts to comply with the law applicable in perjury cases to the quantum of proof; upon error in construing the scope of the second count too broadly; upon other trial errors, including faulty instructions in the charge; and upon the failure to grant his motion to dismiss the indictment and to arrest the judgment.

■ It is well established that the ununcorroborated testimony under oath of one witness is not enough as a matter of law to prove the crime of perjury. Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118. There must be either two witnesses who testify that the accused violated his oath, or one witness to that and corroboration by other evidence which is believed by the jury and is found by it to substantiate the testimony of the one witness. Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495. This corroboration of the testimony of a single witness should be such that it supplies independent proof of facts inconsistent with the innocence of the accused. United States v. Isaacson, 2 Cir., 59 F.2d 966; United States v. Buckner, 2 Cir., 118 F.2d 468, 469.

To determine whether the government's proof in this case complies with this standard, some of the events leading up to the time when the charged perjury was alleged to have been committed should be reviewed. A committee of Congress known as the Committee on Un-American Activities of the House of Representatives had, before August 3, 1948, been conducting investigations as authorized of matters which included subversive activities of governmental employees and others. On the above date Whittaker Chambers appeared before that Committee in Washington in response to a subpoena and testified that he had formerly been a member of the Communist Party in the United States and had been associated with a Communist group or "apparatus" in Washington from 1934 to 1938. The object of this group, he said, was to infiltrate its members into responsible government positions; an ultimate goal was espionage. He further testified that the appellant, Alger Hiss, had been an active member of this organization and of the Communist Party. Mr. Hiss, who had been during that time an assistant to Mr. Francis B. Sayre, Assistant Secretary of State, was, when Mr. Chambers so testified before the Committee, president of the Carnegie Endowment for International Peace and was in New York City. He quickly learned from the press that he had been thus accused and lost no time either in issuing a statement in denial or in informing the Committee that he desired to appear before it and to be given an opportunity to make a denial there. His request was granted and, on August 5, 1948, he appeared before the

Committee in Washington and not only denied categorically that he was, or ever had been, a Communist or a Communist sympathizer, but asserted that he didn't know anyone by the name of Whittaker Chambers. When shown a picture of Whittaker Chambers he could not recognize it as that of anyone he had ever seen and demanded a confrontation.

Mr. Chambers was then recalled, thoroughly examined regarding his acquaintance with the appellant, and gave to the Committee information in considerable detail concerning appellant's places of residence and their arrangement and furnishings, as well as about his habits and family. Mr. Hiss appeared again before the Committee on August 16 but without identifying Chambers as anyone he had known. On August 17, however, Mr. Chambers and Mr. Hiss met for the first time in the course of the investigation in the presence of members of the Committee. Mr. Hiss was told who Mr. Chambers was and was asked if he had ever known him before. The appellant replied by requesting that Mr. Chambers be asked to say something. Mr. Chambers was then asked to give his name and business and he gave his name. Mr. Hiss then walked toward him and asked him to open his mouth wider. He again gave his name and added, "I am senior editor of Time magazine." Mr. Hiss then said, "May I ask whether his voice, when he testified before, was comparable to this?" When told by Mr. McDowell of the Committee, "I would say it is about the same now as we have heard," Mr. Hiss asked to have Mr. Chambers talk "a little more." Mr. Chambers was then asked to read something, but before he did Mr. Hiss said, "I think he is George Crosley, but I would like to hear him talk a little longer." Appellant then said to Mr. Chambers, "Are you George Crosley?" to which Mr. Chambers replied, "Not to my knowledge. You are Alger Hiss, I believe." Mr. Hiss rejoined, "I certainly am," and Mr. Chambers said, "That was my recollection." After this Mr. Nixon of the Committee remarked, "Since some repartee goes on between these two people, I think Mr. Chambers should be

sworn." That was done and Mr. Chambers read from a magazine. Mr. Hiss interrupted to say, "The voice sounds a little less resonant than the voice that I recall of the man I knew as George Crosley. The teeth look to me as though they have been improved upon or that there has been considerable dental work done since I knew George Crosley, which was some years ago." Upon inquiry Mr. Chambers said that he had had extensive dental work done. Mr. Hiss wanted to know the name of the dentist and Mr. Chambers supplied that with the address. Then Mr. Hiss said, "That testimony of Mr. Chambers, if it can be believed, would tend to substantiate my feeling that he represented himself to me in 1934 or 1935 or thereabout as George Crosley, a free lance writer of articles for magazines. I would like to find out from Dr. Hitchcock [the dentist] if what he has just said is true, because I am relying partly, one of my main recollections of Crosley was the poor condition of his teeth." Mr. Chambers then said in reply to a question that his teeth "were in very bad shape" in 1934.

Mr. Nixon of the Committee pressed its inquiry by asking appellant if he felt he would have to have the dentist tell what he did to the teeth before he "could tell anything about this man," to which Mr. Hiss replied, "I would like a few more questions asked. I didn't intend to say anything about this, because I feel very strongly that he is Crosley, but he looks very different in girth and in other appearances —hair, forehead, and so on, particularly the jowls."

The appellant, being questioned further, was unable to give the name of Crosley's wife although he did remember that she had stayed in appellant's house "two or three or four consecutive nights" with her husband and infant child while they awaited a van with their furniture, shortly after they had sub-let the appellant's apartment in Washington. He said that he had made this sub-lease of his apartment for the summer to Crosley at cost after having leased a house on P Street in the spring of 1935, but that Crosley had paid him no rent in

cash, although he had "once paid in kind,"[2] and had borrowed some thirty-five or forty dollars from him in smaller amounts at different times. Concerning the events leading up to this rental, Mr. Hiss recalled that he first met Crosley when the latter came into his office in the Senate Office Building, where appellant was serving as legal assistant to the Senate Munitions Committee, to inquire about the investigation, probably in the fall of 1934. He saw him on business, he thought, ten or eleven times during the next five or six months. In the spring of 1935, Crosley told the appellant that "he was planning to spend the summer months in Washington to complete his search and investigation of the series of articles which he had been engaged upon at the time" appellant first met him. Mr. Hiss then orally sub-let his apartment to Crosley, and learning that Crosley would like to rent a car, told him, "You came to just the right place. I would be very glad to throw a car in because I have been trying to get rid of an old car which we have kept solely for sentimental reasons which we couldn't get anything on for trade-in or sale." Appellant said that car was "one of the first model A Fords." Appellant also testified that Crosley had the use of his apartment and car under this arrangement during the summer of 1935 and that he saw Crosley "several times in the fall of 1935," as he recalled it. He said, "I think he came to my house once or twice after that because of this establishment of a personal relationship. I remember on one occasion he came and brought me a rug which was part payment." Appellant remembered that once when he drove to New York from Washington he took Crosley with him.

The attorney for the Committee then said to the appellant, "Mr. Hiss, you say that person you knew as George Crosley, the one feature which you must have to check on to identify him is the dentures." To this the appellant said, "May I answer that my own way rather than just 'Yes' or 'No'?" And what then followed, up to the time the appellant identified Chambers as the man he had known as Crosley, is now quoted from the transcript:

"Mr. Stripling: Well, now, I would like to preface whatever you are going to say by what I say first.

"I certainly gathered the impression when Mr. Chambers walked into this room and you walked over and examined him and asked him to open his mouth, that you were basing your identification purely on what his upper teeth might have looked like.

"Now, here is a person that you knew for several months at least. You knew him so well that he was a guest in your home.

"Mr. Hiss: Would you—

"Mr. Stripling: I would like to complete my statement—that he was a guest in your home, that you gave him an old Ford automobile, and permitted him to use, or you leased him your apartment and in this, a very important confrontation, the only thing that you have to check on is this denture; is that correct?

"There is nothing else about this man's feaures which you could definitely say, 'This is the man I knew as George Crosley,' that you have to rely entirely on this denture; is that your position?

"Mr Hiss: Is your preface through? My answer to the question you have asked is this:

"From the time on Wednesday, August 4, 1948, when I was able to get hold of newspapers containing photographs of one Whittaker Chambers, I was struck by a certain familiarity in features. When I testified on August 5 and was shown a photograph by you, Mr. Stripling, there was again some familiarity features. I could not be sure that I had never seen the person whose photographs you showed me. I said I would want to see the person.

"The photographs are rather good photostats of Whittaker Chambers as I see Whittaker Chambers today. I am not given on

2. The appellant here referred to an oriental rug which he testified at the trial he so received and which Chambers testi- fied he delivered to Hiss as a present from the Soviet people.

important occasions to snap judgments or simple, easy statements. I am confident that George Crosley had notably bad teeth. I would not call George Crosley a guest in my house. I have explained the circumstances. If you choose to call him a guest, that is your affair.

"Mr. Stripling: I am willing to strike the word 'guest.' He was in your house.

"Mr. Hiss: I saw him at the time I was seeing hundreds of people. Since then I have seen thousands of people. He meant nothing to me except as one I saw under the circumstances I have described.

"My recollection of George Crosley, if this man had said he was George Crosley, I would have no difficulty in identification. He denied it right here.

"I would like and asked earlier in this hearing if I could ask some further questions to help in identification. I was denied that.

"Mr. Stripling: I think you should be permitted—

"Mr. Hiss: I was denied that right. I am not, therefore, able to take an oath that this man is George Crosley. I have been testifying about George Crosley. Whether he and this man are the same or whether he has means of getting information from George Crosley about my house, I do not know. He may have had his face lifted.

"Mr. Stripling: The witness says he was denied the right to ask this witness questions. I believe the record will show you stated 'at this time.' I think he should be permitted to ask the witness questions now or any other motion should be granted which will permit him to determine whether or not this is the individual to whom he is referring.

Mr. Hiss: Right. I would be very happy if I could pursue that. Do I have the Chair's permission?

"Mr McDowell: The Chair will agree to that.

"Mr. Hiss: Do I have Mr. Nixon's permission.

"Mr. Nixon: Yes.

"Mr. McDowell: Here is a very difficult situation.

"Mr. Nixon: The only suggestion I would make in fairness to Mr. Chambers is that he should also be given the opportunity to ask Mr. Hiss any questions.

"Mr. McDowell: Of course.

"Mr. Hiss: I will welcome that.

"Mr. Nixon: Mr. Chambers, do you have any objection?

"Mr. Chambers: No.

"Mr. Hiss: Did you ever go under the name of George Crosley?

"Mr. Chambers: Not to my knowledge.

"Mr. Hiss: Did you ever sublet an apartment on Twenty-ninth Street from me?

"Mr. Chambers: No; I did not.

"Mr. Hiss: You did not?

"Mr. Chambers: No.

"Mr. Hiss: Did you ever spend any time with your wife and child in an apartment on Twenty-ninth Street in Washington when I was not there because I and my family were living on P Street?

"Mr. Chambers: I most certainly did.

"Mr. Hiss: You did or did not?

"Mr. Chambers: I did.

"Mr. Hiss: Would you tell me how you reconcile your negative answers with this affirmative answer?

"Mr. Chambers: Very easily Alger. I was a Communist and you were a Communist.

"Mr. Hiss: Would you be responsive and continue your answer?

"Mr. Chambers: I do not think it is needed.

"Mr. Hiss: That is the answer.

"Mr. Nixon: I will help you with the answer, Mr. Hiss. The question, Mr. Chambers, is, as I understand it, that Mr. Hiss cannot understand how you would deny that you were George Crosley and yet admit that you spent time in his apartment. Now would you explain the circumstances? I don't want to put that until Mr. Hiss agrees that is one of his questions.

"Mr. Hiss: You have the privilege of asking any questions you want. I think that is an accurate phrasing.

"Mr. Nixon: Go ahead.

"Mr. Chambers: As I have testified before, I came to Washington as a Communist functionary, a functionary of the American Communist Party. I was connected with the underground group of which Mr. Hiss was a member. Mr. Hiss and I became friends. To the best of my knowledge, Mr. Hiss himself suggested that I go there, and I accepted gratefully.

"Mr. Hiss: Mr. Chairman.

"Mr. Nixon: Just a moment. How long did you stay there?

"Mr. Chambers: My recollection was about 3 weeks. It may have been longer. I brought no furniture, I might add.

"Mr. Hiss: Mr. Chairman, I don't need to ask Mr. Whittaker Chambers any more questions. I am now perfectly prepared to identify this man as George Crosley."

Before the time when the appellant identified Mr. Chambers as his former acquaintance Crosley, the Committee had before it evidence, much of it testimony of Mr. Chambers, to the effect that the appellant was a member of the Communist Party and active in its behalf when he was employed in the State Department. But up to this time Mr. Chambers had not testified to any breach of trust on the part of the appellant or to the commission of any crime. But matters did not remain long in that posture. Mr. Hiss challenged Mr. Chambers to repeat his accusations when not protected by the immunity afforded a witness before a Congressional committee. He did so, and Mr. Hiss brought suit against him in the United States District Court in Maryland, 8 F.R.D. 480, to recover damages for the alleged tort. During pretrial examinations conducted in that suit the plaintiff took the deposition of Mr. Chambers and demanded his production of whatever papers, if any, he had to support his accusations against Mr. Hiss.

Following that Mr. Chambers did produce on November 17, 1948, forty-three typewritten documents and four memoranda written with pencil. It is now conceded that the memoranda were in the handwriting of Mr. Hiss and that all but one of the documents had been written on a Woodstock typewriter which had belonged to Mr. and Mrs. Hiss and had been kept in their home in Washington. The documents were all dated after January 1, 1938 and ranged in date through the first two months of that year and into the third. These typewritten papers were copies of confidential documents in the State Department which Mr. Hiss could have obtained, and the penciled summaries were of similar documents which obviously he did have at least long enough to enable him to make the memoranda.

These papers so produced proved to be of such a nature that even at the comparatively late day of their disclosure some could not for security reasons safely be made public, and the proper officials of the government were advised and took charge of them. In response to a subpoena duces tecum served upon him by the Committee above mentioned at his farm in Maryland that same evening, Mr. Chambers produced from a pumpkin, in which he had recently hidden them, two rolls of developed micro-film, which had been made of other confidential documents from the State Department, and three rolls of undeveloped micro-film, one of which was found to have been light struck.

A federal grand jury was sitting in the Southern District of New York at the time investigating possible violations of the criminal laws of the United States, including those relating to espionage. Both Mr. Chambers and Mr. Hiss were called before it and testified as witnesses, Mr. Chambers to the effect that the typewritten copies of documents he produced in the civil action brought by Mr. Hiss had been turned over to him by Mr. Hiss in the early months of 1938, and that during the same time the original documents which the micro-films surrendered to the Committee reproduced had been turned over to him by Mr. Hiss to be micro-filmed, and then returned by him to Mr. Hiss. When Mr. Hiss, testifying before the grand jury under oath, flatly denied this as before stated he was indicted for perjury.

At the trial which ended in the conviction of Mr. Hiss, Mr. Chambers testified in great detail concerning his relations with Mr. Hiss in Washington. Indeed it is

perfectly plain that his testimony, believed as it evidently was by the jury, is of such breadth and scope that, if it was adequately substantiated by other evidence as the law requires, there was enough to support the verdict.

His testimony may be summarized as follows: Mr. Chambers was ordered "underground" by the Communist Party and was sent to Washington to act as a courier or liaison man to gather information from Communists or their sympathizers there and to take it to the Communist representative of Russia in New York. He soon was introduced, among others, to Mr. Hiss and told that he was a reliable source. Mr. Chambers became intimately acquainted with the appellant and found him to be a reliable Communist as represented. Their wives became friendly and during the summer, after Mr. Hiss had rented a house on P Street, Mr. and Mrs. Chambers lived in his apartment but did not get a Ford car from him. The families visited back and forth, trips were taken together, Mr. Chambers borrowed $400 of the Hisses when he bought an automobile, and for months they associated on the basis of Communist comradeship. In accordance with a routine they developed, Mr. Chambers customarily called at the Hiss home in the evening about once in two weeks and picked up whatever documents Mr. Hiss had abstracted from the State Department on that day and took them to Baltimore to be micro-filmed. He would then return the originals to Mr. Hiss before daylight the next day. As time went on the two men altered their method so that "production" would be greater. Mr. Hiss would take home each night from the State Department confidential documents which Mrs. Hiss would copy on a Woodstock typewriter they had in their house. These copies would accumulate, and when Mr. Chambers called at the Hiss home on one of his fortnightly visits he would pick up what copies they had, together with any originals Mr. Hiss had that day brought home. What he produced in the pre-trial examination in the civil suit against him was the fruit of his last such pick-up before, having lost sympathy with it, he renounced Communism in 1938. He did not deliver this material to his superior in New York but took it in a package to his wife's nephew in Brooklyn for safe keeping. The nephew testified that he received the package then, that he was not told what was in it, and that he returned it unopened to Mr. Chambers when he called for it.

Tending to substantiate Mr. Chambers' testimony was the concession that all the copied documents produced by him were, save one, copied on the Hiss Woodstock typewriter. According to the testimony of appellant and his wife, that typewriter had been given to one of their servants and taken away from their home before the dates of any of the documents of which Mr. Chambers produced copies, but there was sufficient contradictory evidence, other than that of Mr. Chambers, to enable the jury to find that the typewriter was in the Hiss home during the time when the documents might have been copied on it. Nor does the lack of any direct evidence of *when* the copies were typed (other than the dates of the originals) affect the sufficiency of this corroboration. It was, of course, possible that the copies were typed later either from the originals or from micro-filmed copies of them stored away for this purpose. That, however, was properly a question for the jury, not for this court.

The testimony of Mr. Hiss may be well characterized as a stout and persistent denial that he was, or had been, a Communist or a Communist sympathizer; that he ever turned over any State Department papers or documents to Mr. Chambers or to anyone else who did not have authority to receive them; or that he had seen Mr. Chambers after January 1, 1937. He further testified that he had sub-let his apartment to Crosley, whom he had, as before stated, identified as Mr. Chambers, not only at the rental he was paying for it unfurnished but that he left it partly furnished and had paid for the gas, electricity and the telephone, in addition to providing the Ford car, all without making any charge to his sub-tenant.

▮ Aside from dental repairs, probably more extensive than the average person

requires during such a period, there was nothing to show any change in the appearance of Mr. Chambers which should be unexpected in a man of his age during about ten years between the time the appellant admitted having last seen and known him as Crosley and the time in 1948 when he denied that he could recognize Mr. Chambers. The jury might well have believed that the appellant had been less than frank in his belated recognition of Mr. Chambers as a man he had known as Crosley and had admittedly known well enough to provide for him a partly furnished apartment at cost with all utilities free to say nothing of an. automobile, old certainly, but still useful. The jury had ample evidence other than the testimony of Mr. Chambers on which to find, as it evidently did, that the documents of which Mr. Chambers produced copies were all available to Mr. Hiss at the State Department and that finding, coupled with the admitted fact that they were copied on a typewriter which the jury could well find was used for that purpose when in the possession of Mr. Hiss in his home, supplied circumstances which strongly corroborated the testimony of Mr. Chambers. Indeed, such known circumstances tend to fill out a normal pattern of probability when so interpreted, while in attempting to reconcile them with the appellant's denial of association with the delivery of State Department documents, or their copies, to Mr. Chambers, one approaches the realm of sheer speculation. To the prosecution's theory that the appellant abstracted these copied documents and took them home where they were copied on a typewriter which the jury could, and doubtless did, find was then in his home, the only possible alternative is that one or more others abstracted them (for there is not the slightest evidence or suggestion that this Woodstock typewriter was ever in the State Department) and then took what pains were needed to copy them, or have them copied, on that particular typewriter either at the Hiss home or elsewhere on some later date and, if at the Hiss home, unbeknown to Mr. or Mrs. Hiss. Obviously that would have entailed some risk of detection by the Hisses which the use of some other means of copying would not have involved. It seems abundantly clear that the jury was amply justified in believing that these circumstances did not indicate some ulterior motive to harm the appellant at some future date but in believing that they pinned the abstractions and deliveries fast to the appellant himself. The foregoing is an attempt not to summarize the mass of evidence introduced at the trial below, but only to show, as we think it does, that there was independent evidence sufficient as a matter of law, if believed and so considered by the jury, to substantiate the testimony of Mr. Chambers in compliance with the rule in perjury cases as to both counts.

There was, however, additional evidence in support of count two. Both Mr. and Mrs. Chambers testified that Mr. Hiss met and saw Mr. Chambers at a time after January 1, 1937, not within or about the months of February and March, 1938. Had each testified to a separate occasion, their testimony might, nevertheless, have satisfied the two witness rule in prosecutions for perjury and have taken count two to the jury. United States v. Seavey, 3 Cir., 180 F.2d 837; certiorari denied 339 U. S. 979, 70 S.Ct. 1023; United States v. Palese, 3 Cir., 133 F.2d 600. We are not confronted with that question, however, for the trial judge instructed the jury that the two witness rule required that Mr. and Mrs. Chambers testify to the same occurrence. The jury could have found that they did, for there was no reason to suppose that Mr. and Mrs. Chambers, though failing to identify precisely the same dates, were in disagreement on the fact that they had both met Mr. and Mrs. Hiss in December, 1937. But the appellant insists that count two was so limited by its language that it could not be supported on this evidence. Its language was that when the appellant testified before the grand jury as charged in the count he knew his testimony was untrue "in that the defendant did in fact see and converse with the said Mr. Chambers in or about the months of February and March, 1938."

The appellant moved for particulars as to meetings within the designated period,

requesting no information as to any others claimed to have occurred, and the government supplied the particulars as requested. The record shows that counsel for the government at the hearing on the motion made it perfectly plain that it did not intend to limit its proof at the trial to meetings of Mr. Hiss and Mr. Chambers in or about February and March, 1938, provided it could procure evidence of other meetings. Nor did the appellant claim surprise, or move for a continuance on that ground, or otherwise object to the admission of this evidence. Instead what the appellant did was to request the court to instruct the jury to acquit him on the second count unless it found that he saw Mr. Chambers in or about the months of February and March, 1938, and he excepted to the refusal of his request.

 It is the rule in this circuit that an indictment for perjury is sufficient if it alleges the falsity of the accused's oath without alleging what the truth was. Sharron v. United States, 2 Cir., 11 F.2d 689; United States v. Otto, 2 Cir., 54 F.2d 277. See also Rule 7(c) of the Federal Criminal Rules, 18 U.S.C.A.; Flynn v. United States, 9 Cir., 172 F.2d 12; United States v. Bickford, 9 Cir., 168 F.2d 26. Absent surprise, or some like special ground for relief, the appellant has shown no error in treating as surplusage the language he claimed to be a limitation. Moreover, as the sentences on both counts could lawfully have been imposed upon either, and are the same, and are to run concurrently, the conviction upon either, if without error, would alone sustain the judgment and require its affirmance. Whitfield v. State of Ohio, 297 U.S. 431, 438, 56 S.Ct. 532, 80 L.Ed. 778; United States v. Bronson, 2 Cir., 145 F.2d 939, 944.

The third point made by the appellant is that reversible error was committed when the government called each of two witnesses who, it is said, the prosecutor knew would refuse on the ground of self-incrimination to answer at least some of the questions he intended to ask them. One of these witnesses was Felix Inslerman, who was the man in Baltimore to whom Mr. Chambers testified he took the papers he received from Mr. Hiss to have them micro-filmed. Mr. Inslerman, who had not been a witness at the first trial, testified that he lived in Baltimore and that in about the middle of 1937 while living there he had purchased a Leica camera which he had had ever since, and which he identified as Government's Exhibit 51.[3] Claiming the privilege above stated, he refused to answer when asked if he had during 1937 met a man whose name, he had now been told, was Whittaker Chambers, and also when asked if he had ever protographed any paper documents during that year with that camera.

The other witness whose calling to the stand is assigned as error was William Rosen, whose name appeared of record in Washington, D. C., in the office where certificates of title and transfers of title to automobiles are recorded, as the transferee of the above-mentioned Ford automobile. His transferor was the Cherner Motor Company, which was, according to the record in the same office, the transferee of Alger Hiss who signed and swore to that transfer on July 23, 1936. At investigations previous to the trial, Rosen had refused on the ground of self-incrimination to answer some questions concerning these transfers. He had been adjudged in contempt and sentenced therefor when he so refused as a witness before the federal jury in New York. This was reversed by this court. United States v. Rosen, 174 F. 2d 187, certiorari denied 338 U.S. 851, 70 S.Ct. 87. The government knew that he would refuse to answer some of the questions he would be asked when called at this trial and so did Mr. Cross, trial counsel for the appellant, who at once objected

---

3. Webb, a government expert, testified that tests showed that this was the camera used to make the micro-films which Chambers had produced. Inslerman's and Webb's testimony was not irrelevant, as appellant contends, for it tended to confirm Chambers' testimony that he had the documents and that he gave them to Inslerman to photograph, matters which, although not contested by Hiss, were an integral part of Chambers' story.

on the ground stated. The witness did claim his privilege against self-incrimination and refused to answer any questions having reference to the Ford automobile or to its transfer, or to whether he was a Communist. He also testified favorably to Mr. Hiss in that he denied that he knew him; that he had ever had any relations with him; or that he had ever seen him before the trial. The judge told the jury when this witness left the stand "to draw no inference unfavorable to this defendant because of the fact that this witness * * * has claimed immunity."

■■ In some state court decisions language has been used which may support the appellant on this point.[4] In an earlier opinion of this court, after noticing that Professor Wigmore held the view that the privilege was but an option to refuse to answer and not a prohibition of inquiry, 8 Wigmore on Evidence, 3d Ed. § 2268, we remarked by way of warning, "Nevertheless we are not prepared to say that it would not be ground for reversal if the party who called a witness connected with a challenged transaction knew, or had reasonable cause to know, before putting the witness on the stand that he would claim his privilege."[5] We do not now say that such an abuse might not sometime occur so as to require reversal, but we find no such abuse occurred below. Cf. Weinbaum v. United States, 9 Cir., 184 F.2d 330; dec'd Sept. 19, 1950; People v. Kynette, 15 Cal.2d 731, 104 P.2d 794, certiorari denied 312 U.S. 703, 61 S.Ct. 806, 85 L.Ed. 1136. Where a prosecutor is charged with conduct so prejudicial as to amount to reversible error, the charge should be made good by showing a successful effort to influence the jury against a defendant by some means clearly indefensible as a matter of law. It it not enough if there are no more than minor lapses through a long trial. United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 239-240, 60 S.Ct. 811, 84 L.Ed. 1129. Cf. United States v. Buckner, 2 Cir., 108 F.2d 921, 928, certiorari denied 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016.

■ The grounds for the motion to strike the testimony of Mrs. Massing, which was denied, were its lack of weight and the questionable credibility of the witness, neither touching admissibility. The basis for the objection to the testimony of Mrs. Murray was that it was out of order in that it was received in rebuttal. These are matters so clearly within the discretion of the judge who so clearly exercised it well that we think no more need be said.

■ Mr. Hiss on direct examination had testified to conversations he had had with Mr. Dulles, chairman of the board of the Carnegie Endowment, concerning appellant's employment as its president; concerning charges of his having been a Communist or having been associated with Communists; and what he had done at times to refute such charges. The implication was that Mr. Dulles, having learned the facts as to such accusations, did not credit them. This testimony, if believed, would have afforded evidence of the good character of Mr. Hiss in addition to the direct evidence to that effect in the testimony of the character witnesses he called. In rebuttal, the government called Mr. Dulles who testified without objection in partial contradiction. After both parties had rested and the summation for the appellant had been finished, a motion was made to strike the testimony of Mr. Dulles on the ground that the contradiction of Mr. Hiss on an immaterial matter had been permitted in rebuttal. Its denial is now claimed to be reversible error. We cannot agree. Insofar as Mr. Dulles' testimony may be said to be contradictory, it tended to refute the inferences of good character which might otherwise be drawn from the testimony of Mr. Hiss, and was therefore not collateral, but bore directly upon an issue he had raised himself. Moreover, what is within the scope of permissible contradiction is largely a matter of avoiding confusion of issues, and as such should be left to the discretion of the trial judge. Cf. Moyer v. Aetna Life Ins. Co., 3 Cir., 126 F.2d 141; Salem News Pub. Co. v.

4. McClure v. State, 95 Tex.Crim.R. 53, 251 S.W. 1099; Rice v. State, 121 Tex. Crim.R. 68, 51 S.W.2d 364.

5. United States v. Five Cases, etc., 2 Cir., 179 F.2d 519, 523.

Caliga, 1 Cir., 144 F. 965; Lizotte v. Warren, 302 Mass. 217, 19 N.E.2d 60.

It is sufficient also to dispose of the attack upon the government's chief trial counsel by referring to what has previously been said in respect to his calling the witnesses Inslerman and Rosen. There was nothing in his general conduct which can justify reversal.

The charge of the court was clear and comprehensive with such due attention to detail in respect to the law relevant to the facts which might be found upon the evidence that all the requests to charge which should have been granted were adequately covered. We find no error in it.

The effort to have the judgment arrested and the indictment dismissed was induced by a clearly untenable theory that the statute of limitations had barred the prosecution of the offense charged in the indictment.

Judgment affirmed.