**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Anthony G. "Amos" AMADIO, Defendant-Appellant.**

**No. 11042.**

United States Court of Appeals Seventh Circuit.

Aug. 30, 1954.

Rehearing Denied Sept. 21, 1954.

Major, C. J., dissented.

Bert C. Cheatham and Marion J. Rice, Evansville, Ind., for defendant-appellant.

Jack C. Brown, U. S. Atty., Indianapolis, Ind., Stephen Leonard, Asst. U. S. Atty., Anderson, Ind., Wm. Sparrenberger, Asst. U. S. Atty., Robert J. Wilson, Asst. U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before MAJOR, Chief Judge, and LINDLEY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Defendant appeals from a judgment of the District Court, based upon a jury's verdict, adjudging him guilty of violating §§ 2421, 2422, title 18 U.S.C.A., commonly referred to as the White Slave Act.

1. He contends that the District Court erred in overruling his motion, which was seasonably made, to dismiss the indictment on the ground that it does not state facts sufficient to constitute an offense against the United States.

The jury found the defendant guilty on counts I and IV and not guilty on counts II, III and V.

Do counts I and IV set forth federal criminal offenses?

The gist of count I is a charge that defendant induced Frieda West to travel in interstate commerce for an immoral purpose, and the gist of count IV is that he and one Craig transported Mary Katherine Hamilton in interstate commerce for an immoral purpose.[1]

Count I reads as follows:

"That on or about August 30, 1952, Anthony G. ("Amos") Amadio did unlawfully and knowingly induce Frieda West to travel in interstate commerce from Evansville, State of Indiana, in the Evansville Division of the Southern District of Indiana, to Chicago Heights, State of Illinois, for an immoral purpose, to wit, to place her in employment and environment in Calumet City, Illinois, which would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality. Anthony G. ("Amos") Amadio thereby caused the said Frieda West to go and to be transported as a passenger from Evansville, Indiana, to Chicago Heights, Illinois, upon the lines of

---

1. Counts II and III refer to other females, and count V charges that the defendant on or about September 18, 1952, unlawfully and knowingly induced Mary Katherine Hamilton, a fifteen year old girl, to travel in interstate commerce, with the intent and purpose that she be induced to engage in prostitution, debauchery, and another immoral practice, to wit, to work and to reside in Calumet City, Illinois, in an environment which would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality and thereby caused her to go and to be transported as a passenger on a railroad from Evansville, Indiana, to Chicago Heights, Illinois.

the Chicago and Eastern Illinois Railroad, a common carrier."

§ 2422 reads as follows:

"Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia, or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Count I charges in the language of the statute that defendant knowingly induced Frieda West to travel in interstate commerce for an immoral purpose and thereby caused her to go and to be transported as a passenger upon the lines of the Chicago and Eastern Illinois Railroad from Indiana to Illinois. It charges a criminal offense under § 2422.

 The term "immoral purpose", by reason of association with the term "prostitution", is restricted in meaning to immorality consisting of sexual debauchery, U. S. v. Lewis, 7 Cir., 110 F. 2d 460, 462; Burgess v. U. S., 54 App. D.C. 71, 294 F. 1002, 1004, and, as thus limited, the language of the statute furnishes a sufficiently definite description of the condemned conduct. U. S. v. Lewis, supra, 110 F.2d 462. Furthermore, there is transportation for an immoral purpose if there is transportation of a female for the purpose of having her "engage in acts which tend ultimately to lead to that form of debauchery or immoral conduct which consists in 'sexual actions' ". Burgess v. U. S., supra, 294 F. 1004. Count I goes further and sets forth what the specific immoral purpose of the defendant was. This purpose is stated to be "to place her in employment and environment in Calumet City, Illinois, which would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality". Whether or not it was necessary to thus specifically state the immoral purpose, it is unnecessary for us to decide. Having stated it in such detail, the question arises as to whether such purpose as thus stated in detail is likewise within the condemnation of the statute. We hold that if the purpose of the defendant was, as alleged, to place the transported girl in employment surrounded by influences which would tend to induce her to give herself up to a condition of debauchery which eventually and naturally would lead to a course of sexual immorality, then an offense was charged under § 2422. Athanasaw v. U. S., 227 U.S. 326, 33 S.Ct. 285, 57 L.Ed. 528, 530.

There was therefore no error committed by the District Court in denying the motion to dismiss as to count I.

Count IV reads as follows:

"That on or about August 16, 1952, Anthony G. ("Amos") Amadio and Grover C. Craig did unlawfully and knowingly transport Mary Katherine Hamilton in interstate commerce from Evansville, State of Indiana, in the Evansville Division of the Southern District of Indiana, to Calumet City, State of Illinois, for an immoral purpose, to wit, to place her in employment and environment in Calumet City, Illinois, which would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality."

The pertinent parts of § 2421, title 18 U.S.C.A., read as follows:

"Whoever knowingly transports in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice;

\* \* \* \* \* \*

Shall be fined not more than $5,-000 or imprisoned not more than five years, or both."

█ Count IV charges an offense under § 2421 in the language of the statute and states in detail, as does Count I, what the immoral purpose of the defendant was.

No error was committed by the District Court in denying the motion to dismiss count IV.

2. On the same day that defendant filed a motion to dismiss the indictment he also filed a motion for a written bill of particulars calling for details of the government's case against him. The motion for a bill of particulars was denied and it is urged by the defendant that this was error. The details called for by this motion are many and constitute eleven pages of the printed transcript of record herein.

█ In view of the clear language of counts I and IV of the indictment, including the detailed definition of the term "an immoral purpose", we think that the District Court did not abuse its discretion in denying the motion for a bill of particulars. Nothing in the record before us indicates that defendant was prejudiced thereby. In Wong Tai v. United States, 273 U.S. 77, at page 82, 47 S.Ct. 300, at page 302, 71 L.Ed. 545, the court said:

"The application for the bill of particulars was one addressed to the sound discretion of the court, and, there being no abuse of this discre-

tion, its action thereon should not be disturbed. See Rosen v. United States, 161 U.S. 29, 40, 16 S.Ct. 434, 480, 40 L.Ed. 606; Dunlop v. United States, 165 U.S. 486, 491, 17 S.Ct. 375, 41 L.Ed. 799; Knauer v. United States, 8 Cir., 237 F. 8, 13; Horowitz v. United States, 2 Cir., 262 F. 48, 49; Savage v. United States, 8 Cir., 270 F. 14, 18. And, there is nothing in the record indicating that the defendant was taken by surprise in the progress of the trial, or that his substantial rights were prejudiced in any way by the refusal to require the bill of particulars. See Connors v. United States, 158 U.S. 408, 411, 15 S.Ct. 951, 39 L.Ed. 1033; Armour Packing Co. v. United States, 209 U.S. 56, 84, 28 S.Ct. 428, 52 L.Ed. 681; New York Central & H. R. R. Co. v. United States, 212 U.S. 481, 497, 29 S.Ct. 304, 53 L.Ed. 613."

3. Defendant contends that his conviction was not supported by substantial evidence and that it was the duty of the trial court to direct an acquittal.

There is evidence in the record tending to prove the facts as set forth below.

Amadio (hereinafter referred to as defendant) was, at the time of the trial, 38 years old. He was the owner of a tavern on State Street in Calumet City, Illinois, known as the Derby Club. It was located in a two-block section which included 26 taverns and night clubs, 19 of which featured entertainment primarily of a sexual nature. Almost all of the taverns and night clubs had "B girls". This term indicates that they were engaged in soliciting drinks from men customers. These drinks were bought and consumed on the premises and the "B girls" received a commission upon the sales. They sat on the laps of men customers and exposed various parts of their bodies, all parts of which were fondled by men customers, who embraced these girls.

In most of the places which featured entertainment, it consisted of floor-shows in which the women entertainers engaged in the gradual removal of their clothes

until they were practically nude. Some of these entertainers also performed the duties of "B girls". These places were open from 6 A. M. to 4 A. M., and some, including the Derby Club, operated seven days a week. A woman, who came into the Derby Club, took off all her clothes except a garter belt and hose and asked customers to buy her a drink. She was not ejected from the tavern.

In the same section was another tavern known as the Four Aces, above which the girl employees of defendant slept, three in a bed. This building was owned by defendant whose brother was operating it under a lease. In walking directly from the Derby Club to these sleeping quarters, it was necessary to pass other taverns. Defendant gave his girl employees money to see the shows in this area and they saw most of them.

Photographs in evidence, taken at night, show both sides of State Street lined predominantly with taverns, all of which emblazon in brightly illuminated signs the operators' characterization of what may be found within. Typical are "Little Club—All Girl Show", "All Girl Revue", "Floor Show", "Lovely Girls", "Salome's Dance of the Seven Veils", "Show Club—Exotic Girls".

The foregoing conditions existed from August, 1952, and through early 1953.

Defendant had some interests in oil wells near Evansville, Indiana, and made trips to that city where Craig, his nephew, lived. Craig, on one or two occasions, made trips to Calumet City with defendant to visit his brother who was playing in a band there. Defendant told Craig that if at any time Craig "found a girl", defendant would give him "money for a ticket to send her up" and in accordance with this arrangement he had given Craig money on one or two occasions.

Mary Katherine Hamilton, in 1952, was fifteen years old and was living with her mother and stepfather in Evansville, Indiana. She knew Craig. In 1952, Craig introduced her to defendant who offered her a job as a waitress in Calumet City if her mother would sign a paper stating that she was eighteen years old and consenting to the employment. She needed a job because her stepfather was in the penitentiary. Defendant wrote a note and she had her mother sign it. Thereupon, in the last part of August, 1952, defendant and Craig took Mary in defendant's Cadillac car to Calumet City. This was the first time she had gone away from home to work. They arrived in Calumet City at 2 A. M. and defendant gave Mary a room above the Four Aces Club. The next evening she went to the Derby Club and was assigned to work as a "B girl" and was instructed to ask men to buy her drinks. The bartender at the Derby Club, a Mrs. Johannas, told her to get all the drinks she could and "see what I could do with the guys". At her request, men bought her drinks. They were actually non-alcoholic. She got a commission on all sales which she procured and she also was guaranteed a salary of $40 per week. This arrangement was made with defendant and Craig before Mary went to Calumet City. From her weekly salary $10 was deducted to pay for her room rent above the Four Aces.

The Derby Club was operated in a large room with a bar and booths in the front and in the back. There was a band. Mary worked in the front booths. If a customer would buy a higher priced drink, the waitress took him to the back booths where it was darker. Defendant said "that's where the guys can feel around." Mary saw one "B girl" take a man to a back booth where he bought her drinks and "made love to her".

After Mary had been there quite a while, Mrs. Johannas told her that she could "take guys out for intercourse and make some money that way" after she got off from work at night.

During her third week at the Derby Club, Craig followed her to her room above the Four Aces and unsuccessfully attempted sexual intercourse with her. Two or three days later, defendant came to her room in the early morning after she had finished work and forced her to have intercourse with him. He then told

her that "he could make dates for me with these oil field workers to come in and I could make quite a bit of money off of them if I would have intercourse with them."

In August, 1952, Craig, with two girl friends of Frieda West, came to her home in Evansville, Indiana, at 6:30 A. M. and asked if she wanted to go to Calumet City to work at the Derby Club as a hostess. It was arranged that she and the other two girls would go by train to Chicago Heights. At 3 P. M. that day, Craig took the three girls to the train station, bought their tickets, and put them on the train, telling them to call the Derby Club upon their arrival and they would be picked up. When they reached Chicago Heights they telephoned the Derby Club and defendant and his brother picked them up, after which they went to defendant's home where they were placed in another car and driven by defendant's brother to the Four Aces. There they were given a room and thereupon were employed as "B girls" at the Derby Club.

Mrs. Johannas told Frieda that "she thought I had more brains than the rest of the girls did and if I would come down to the Club during the day she would show me how to make more money than what I could make off the 'B' drinks of the night." She also said that "there was a fellow * * * who wanted to go to a hotel * * * there was a back room there with a day bed that could be used in the back of the Derby Club * * * whatever we made we was supposed to split it—with the cash register."

Frieda stayed in Calumet City one week. Defendant then drove her home to Evansville and asked her to go back to Calumet City, but she refused.

In answer to his counsel's question, defendant testified that he gave attention a couple of hours a week to the management of the Derby Club.

Defendant says that this case raises an issue of whether or not the evidence shows that these girls were employed in an environment which would tend to cause them to give themselves up to a condition of debauchery, which would eventually and naturally lead to a course of sexual immorality, making interstate transportation of them for such employment a federal offense. We think that the foregoing evidence does so show.

"Environment" means the surrounding conditions, influences, or forces, which influence or modify, and "social environment" comprises everything to do with human activity. Webster's New International Dictionary.

In the case at bar, both the employment and the environment had a tendency to cause these girls to give themselves up to a condition of debauchery.

Employment of these girls by defendant in his tavern required them to work nearly all night, seven days a week, in a bar room where gross lewdness and sexual immorality were not only tolerated, but the very arrangement of the booths and instructions to the girls show that, at all times, the predominating motif was sexual over-indulgence. These girls were required by the defendant to live above another tavern where they were the accessible sexual prey for defendant and Craig, who served as a lackey and girl procurer for defendant. Their employment brought them into nightly contact with a female bartender who gave the girls their instructions. This woman's sense of morality was such that she suggested to both of these girls that they make money by prostituting themselves, one-half of the proceeds to go to the Derby Club. This female promoter of prostitution was as much a part of the environment in which the defendant placed these girls as were the dimly lighted booths and the bar. Defendant's testimony that he was at the Derby Club only a couple of hours a week, elicited by a question from his own counsel, was obviously an attempt by defendant to disclaim responsibility for what transpired there. No doubt the jury, as the triers of the facts, did not believe defendant's disclaimer of responsibility.

The businesses in the area, in which the Derby Club and the girls' sleeping quarters were located, were operated to

the accompaniment of a blatant emphasis on sexual activity. Nearly the entire area of two blocks was devoted to taverns and night clubs which, both inside and outside, featured lewdness. It is a matter of common knowledge that when a sign in such an area advertises exotic girls it means erotic girls. Both the place of employment and the place of habitation of the girls mentioned in counts I and IV of the indictment were located in the very midst of a concentrated area of vicious sexual immorality. Defendant saw to it that these girls would learn about their environment. He supplied them with money to attend the night clubs, nineteen of which featured entertainment primarily of a sexual nature.

Life as a "B girl" in defendant's tavern, with its surrounding conditions, would not only tend to cause a girl to give herself up to a condition of debauchery, which would eventually and naturally lead to a course of sexual immorality, but any other result could not reasonably be expected. There was substantial evidence to support the verdict and the trial court committed no error in refusing to direct an acquittal of the defendant.

4. Defendant urges that the trial court erroneously permitted the district attorney to elicit from his own witness, Mary Katherine Hamilton, testimony of the conversation which the witness said she had with Mrs. Johannas, the bartender in the Derby. As above pointed out, on that occasion Mrs. Johannas is alleged to have suggested to Mary that she engage in prostitution. Defendant contends that the introduction of this evidence amounted to an attempt to bind the defendant, as principal, with the statements of an employee made out of the presence of the defendant. This evidence was not offered on the theory of agency. It was offered and admitted on the theory that the presence of Mrs. Johannas, as bartender, who gave instructions to the girl employees, and her attitude expressed to them in regard to sex matters, were a part of the tavern environment into which defendant placed Mary. For that purpose we feel that the evidence was admissible.

When the government witness, Frieda West, testified to a similar suggestion made to her by Mrs. Johannas and the trial court indicated that it was admissible to show environment, defendant's counsel had the court instruct the jury that this evidence should be considered only for the purpose of showing environment.

5. The government called Geno Sarbo as its witness. When asked, on direct examination, whether he had ever been up above the Four Aces in 1952, he stated that he did not remember; he did not think so. He was later asked, "Did you testify that you have not been in the Four Aces, to the best of your recollection; that is what you stated?" He answered "I don't think so". He was then asked whether he had observed any change in the general conditions in the area where the Four Aces Club was located during the year 1952. The witness stated at first that he did not know what was meant by "change". After an explanation by counsel he said that he "guessed" that conditions were substantially the same at the latter part of 1952 as they were throughout the year, but when asked if that was his opinion he said he was not sure. The government counsel argued that he had a right to impeach this witness because "the prosecution is under a legal duty to call" him. The court remarked "He has made other inconsistent statements". The court thereupon permitted government counsel to ask if it was not true that Sarbo told an F.B.I. agent, named Riley, that he had taken a girl named Patricia Swartz up above the Four Aces and had had sexual relations with her. The court held that Sarbo was a hostile witness. The witness refused to answer on the ground that his answer might incriminate him. He specifically refused to answer, on the ground of self-incrimination, as to whether he did, in fact, take girls up above the Four Aces in 1952 and have relations with them. The court continued to overrule objections to other such questions

as they were asked and the witness continued to claim immunity from self-incrimination. Upon examination by defendant's counsel, Sarbo charged government counsel with having intimidated him on the day before by mentioning his prior arrests and speaking of perjury. He also testified that he was then informed by government counsel that he could claim immunity from testifying.

The government then called a witness, Mary Patricia Swartz, and questioned her, evidently in an attempt to have her admit having had intercourse with Sarbo in the Four Aces Club in December, 1952, or January, 1953. She refused to answer on the ground that she "did not want to incriminate" herself. The jury, being excluded, the court referred to the witness as a "hostile witness". During a colloquy between court and counsel, defendant's counsel requested the court to instruct the jury to disregard the conduct of the witness and that it was not to be prejudicial or held against the defendants.[2]

In the presence of the jury Miss Swartz said that she was at the Four Aces Club in January or February, 1953, but she refused to answer whether she was there with Sarbo on the ground that her answer might incriminate her.

The jury, being excused, Miss Swartz was asked about two statements which she gave to F.B.I. agent Riley. She admitted that government counsel, before she was called as a witness, asked if she was ever upstairs in the Four Aces, and that she had answered "Yes." Thereupon, government counsel told her that "We are having you down here to ask you one question" and that she said "What if I don't want to answer it?" and the attorney said "You will have to."

The court indicated that she was privileged to refuse to answer the question.

However, in the presence of the jury, government counsel asked Miss Swartz if she had not, in February, 1953, told agent Riley that she had relations with Sarbo at the Four Aces in January, 1953. She answered in the affirmative and stated that "First I replied no" and then she answered "Yes". She testified that a couple of days later in another interview with Riley she did not say that she had intercourse with Sarbo above the Four Aces in January, 1953, "Because every time I would answer yes he would say 'oh you mean no' ". She added "He was getting me all mixed up". She said she was 18 years old and was a bartender.

We think it is clear that the government knew before these two witnesses were called to testify that they intended to refuse to answer the questions deemed by the government to be pertinent to the case on trial, on the ground of their constitutional privilege against self-incrimination. In view of that fact it was improper for the government to attempt to force them to testify. U. S. v. Hiss, 2 Cir., 185 F.2d 822, 832. In the Hiss case the court told the jury, when the witness who claimed his privilege against self-incrimination, left the stand, "to draw no inference unfavorable to this defendant because of the fact that this witness * * * has claimed immunity." The court, 185 F.2d at page 832, said:

"We do not now say that such an abuse might not sometime occur so as to require reversal, but we find no such abuse occurred below."

In the case at bar the proceedings involving the witnesses Sarbo and Swartz involve a most clumsy handling of the government's case, which might well have affected the jurors adversely to the government. Government counsel were responsible for leading the

---

2. At the conclusion of the trial the court did give the following instruction: The fact that during the course of this trial certain witnesses called by the Government have refused to answer certain questions directed to them which may have had some bearing on this case, should not be construed against the defendants in any way, since the said witnesses, by so refusing to answer, were merely standing upon their constitutional right not to subject themselves, by self-incrimination, to possible criminal prosecution.

court to commit error. The effect of the error was in part erased by the cautionary instruction given by the court. The prejudice; if any there be, was of such character that it might be cured by an instruction to disregard. Weinbaum v. U. S., 9 Cir., 184 F.2d 330. Moreover, the evidence which actually permeated through the extended and confusing proceedings was very slight, uncertain and unconvincing. This meager evidence could not have prejudiced the jury against the defendant, especially in view of the fact that there was sufficient competent evidence in the record to support the verdict. The burden to show reversible error is on the defendant. U. S. v. Reed, 2 Cir., 96 F.2d 785, 786; certiorari denied 305 U.S. 612, 59 S.Ct. 71, 83 L. Ed. 399. In Guy v. U. S., 71 App.D.C. 89, 107 F.2d 288, at page 290, the court said:

> "When guilt is clearly established by competent evidence, error in the admission or exclusion of other evidence or in the charge to the jury which does not affect the substantial rights of the accused does not call for the reversal of a conviction. It has been held that the party who complains has the burden of showing that improperly admitted evidence is prejudicial. * * * No evidence which was admitted over appellant's objection, or which is open to any possible objection, materially strengthened the government's case; and no evidence which was offered by appellant, and excluded, would have materially weakened the government's case."

Certiorari denied 308 U.S. 618, 60 S.Ct. 296, 84 L.Ed. 516. To the same effect is Whitaker v. U. S., 9 Cir., 5 F.2d 546. Certiorari denied 269 U.S. 569, 46 S.Ct. 25, 70 L.Ed. 416.

The error was not prejudicial to the defendant and is, therefore, not ground for reversal.

6. On cross-examination of the defendant, the government attorney asked him whether he had not been convicted of disorderly conduct in Chicago. The court overruled an objection to the question and the defendant denied such a conviction.

In view of all the evidence in this case, we cannot say that the defendant was thereby prejudiced.

In its brief in this court the government makes no mention of this matter except to state categorically that "We deny the general proposition of law stated in proposition XI". The brief as to this matter, as well as many other phases of this case, is woefully inadequate.

7. Defendant urges that the trial court committed error in denying his motion for a mistrial following the admission of testimony of Edwin Keck, a newspaper reporter from Hammond, Indiana.

Keck had testified in considerable detail to conditions as he saw them in the two-block area in which defendant's tavern and the sleeping quarters for his girl employees were located. He described objectively the action of the "B girls" and entertainers. At different times he characterized this conduct as vulgar, lurid or lewd. When objections were made to such conclusions by the witness they were sustained. It is obviously difficult for a witness to describe lewd conduct in words without using such adjectives as were objected to in this case. However, his detailed description of what he actually saw was before the jury and we feel that there was no error in denying the motion for mistrial.

8. Defendant points to 14 instructions tendered by him and refused by the court. He claims they should have been given. We have examined each of them carefully and find that there was no error committed in their refusal. Some of them are repetitious of given instructions, others are not applicable to the issues upon which this case was tried and the remaining ones state incorrect propositions of law.

For the reasons hereinbefore set forth, the judgment of the District Court should be and is hereby

Affirmed.

MAJOR, Chief Judge (dissenting).

My study of the record leads to the firm conclusion that defendant did not have a fair trial, and I feel obliged to register a dissent. In doing so, I realize the futility of any extended discussion, and shall attempt to confine myself to a few of the errors which are typical of many others.

First, with reference to the indictment. I do not disagree with the conclusion of the majority that the allegations of the indictment comport with language contained in the statute. The difficulty arises from the fact that each count in question goes far beyond the statutory provisions. There is nothing in the statute which proscribes the transportation of a female in an "environment" which "would tend to cause her to give herself up to a condition of debauchery which would eventually and naturally lead to a course of sexual immorality." Whether this allegation foreign to the language of the statute invalidated the indictment need not be resolved in dissent; however, it can hardly be doubted but that it created an issue by which the trial court was led astray and which was utilized by the government to obtain the admission of much incompetent testimony.

The government in its brief states, "This was a White Slave Traffic Act case brought under the construction of such Act in the cases of Athanasaw v. United States (1913) 227 U.S. 326 [33 S.Ct. 285, 57 L.Ed. 528], and United States v. Lewis (7 Cir., 1940) 110 F.2d 460. The indictment was couched in the language of the indictment in the Lewis case." This must be a novel theory and I think unsound. It has always been the rule, so far as I am aware, that an indictment must be predicated upon the language of a statute, upon the matters thereby proscribed, rather than upon language used by a court in discussing the statute. Moreover, the indictment was not "couched in the language of the indictment in the Lewis case." There, it was alleged, 110 F.2d at page 462, that the transportation was for an immoral practice, to wit, "prostitution and debauchery."

There was no such indefinite and uncertain language as "environment" or "tend to cause" or "which would eventually and naturally lead to a course of sexual immorality." Neither was there such language in the indictment of the Athanasaw case. There, it was alleged that the transporation was "for 'the purpose of debauchery' ". [227 U.S. 326, 33 S.Ct. 286.] It is true that in both of those cases the court discussed and held that the environment in which the girls were placed was a material factor in proving the charges alleged. But a reading of the opinions in those cases discloses that they furnish little, if any, support for the theory pursued by the government in the instant case, which, as the record discloses, was reluctantly followed by the trial court.

A person unacquainted with the charge would obtain the impression that the sole issue in the case was the environment of a two-block section contained in Calumet City. On this premise, all kinds of evidence calculated to inflame the minds of the jury and create prejudice against the defendant was admitted, which cannot possibly be justified by any rule of which I am aware. Some of this evidence is referred to in the majority opinion, and as shown, statements made out of the presence of the defendant and activities with which he had no connection were shown, all on the issue of environment. The majority opinion gives a fair summary of the government's impeachment of its witnesses, Sarbo and Swartz, by showing statements they had previously made to agents of the F.B.I. It was not shown and it is not claimed that defendant was connected with any of the statements or events related in this testimony. The majority concedes that this was error, with which I agree. To say that it involves "clumsy handling" by government's counsel is a temperate characterization, and to me the view is inescapable that this performance by government's counsel was prejudicial to defendant. More than that, the majority in disposing of this issue states, "The burden to show reversible error is on the defendant." I think that is an er-

roneous pronouncement, and even the cases relied upon furnish little, if any, support. In McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L.Ed. 1205, the court stated, " * * * an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it *affirmatively* appears from the whole record that it was not prejudicial." See also Bihn v. United States, 328 U.S. 633, 638, 66 S.Ct. 1172, 90 L.Ed. 1485. In Kotteakos v. United States, 328 U.S. 750, 764, 66 S. Ct. 1239, 1247, 90 L.Ed. 1557, the court stated, "And the question is, not were they [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting."

These cases and many others which could be cited support the rule that when an error has been shown or admitted relating to the substantial rights of a party, it is grounds for reversal unless it affirmatively appears from the record that it was not prejudicial. If in the mind of the reviewing court the error was calculated to prejudice the rights of the defendant, or even if the court is in doubt on that score, it is its duty to reverse.

A government witness, an admitted prostitute by the name of Juanita Rose Cooper, was permitted to testify that she had sexual relations in a room above the Four Aces with a man whom she knew only as Frank, in January, 1953. This was some four months subsequent to the time the girls named in the two counts of the indictment under consideration were transported. More than that, it was some three months after the girls so named had returned to their homes in Indiana. There was no showing that the witness Cooper's alleged acts were known to the defendant at any time, much less at the time of the transportation, nor was her conduct known to the girls named in the indictment. A government witness, Virginia Warren, was permitted to testify that she was in the Derby Club in December, 1952, when an intoxicated girl from the street came in, took off her clothes and asked for somebody to buy her a drink. Again, this incident took place long after the transportations in question and after the transportees had returned to their homes in Indiana. The court approved an instruction in the Athanasaw case, 227 U.S. 326, 33 S.Ct. 285, 286, "The intent and purpose of the defendant at the time of the furnishing of this transportation * * * is the very gist and question in this case."

The testimony of government's witness, Ann Christine Cresno, was, in my view, highly prejudicial to defendant. It occupies seven pages of the printed transcript and consists in the main of a harangue between counsel and the court regarding the attempt to obtain from this witness the admission that in 1952 she had performed abortions in the two-block area in question. This the witness denied and, upon being declared a hostile witness by the court, the government's counsel was permitted to cross-examine her. Finally, for the purpose of impeachment I suppose, the witness was asked if she had not in a conversation with F.B.I. agents stated that she had performed such abortions. She denied making such a statement. After the government laid the basis for impeachment of this witness, the record discloses that no effort was made to do so.

The character of the charge in this case was such as to make it difficult for a defendant to obtain a fair trial. It was grossly unfair for the government to attempt to create in the minds of the jury the belief that Calumet City was an abortion center. The fact that it did not succeed was not likely to remove from their minds the damaging effect of the effort.

The majority opinion refers to the fact that on cross-examination of the defendant the government attorney inquired whether he had previously been convicted of disorderly conduct. This the defendant denied. After laying a basis for impeachment, the government made no effort to prove that defendant's denial

was false. Defendant in his brief states there was no such conviction, "which the District Attorney well knew never existed and was done solely to prejudice the jury against the defendant." A serious charge has thus been leveled at government's counsel. No denial or explanation is attempted. Counsel's conduct was reprehensible if the question complained of was asked with knowledge that there was no record of a conviction. If the question was asked through a mistaken belief that such a record existed, fairness required as a minimum that it be admitted, not ignored. Assuming that this incident alone would not constitute prejudicial error, it is significant when added to the accumulation of errors which in their totality should, in my opinion, be held to constitute reversible error. Paraphrasing the language of Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 453, 69 S. Ct. 716, 93 L.Ed. 790, defendant was confronted with a hodgepodge of acts and statements by strangers, which he did not authorize and about which he had no knowledge, which in all probability helped persuade the jury that the transportations in question were for the purpose denounced by the statute.