**In re Alger HISS, Petitioner.**

**No. 78 Civ. 3433.**

United States District Court,
S. D. New York.

July 15, 1982.

Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for petitioner; Victor Rabinowitz, Gordon J. Johnson, Ellen J. Winner, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for respondent; Mary C. Daly, Gregory L. Diskant, Asst. U. S. Attys., New York City, of counsel.

Windels, Marx, Davies & Ives, New York City, for amicus curiae The Washington Legal Foundation; J. Daniel Mahoney, Yvette Harmon, New York City, of counsel.

## OPINION

OWEN, District Judge.

In the year 1950, petitioner Alger Hiss, after a two-month jury trial in this Court, was convicted of two counts of perjury on an indictment by a grand jury containing the following charges:

### COUNT I

\* \* \* \* \* \*

4. That at the time and place aforesaid, the defendant Alger Hiss, duly appearing as a witness before the said Grand Jurors, and then and there being under oath as aforesaid, and having been duly advised of the nature of the investigation then and there being conducted, testified falsely before said Grand Jurors with respect to the aforesaid material matter as follows:

Q. Mr. Hiss, you have probably been asked this question before, but I'd like to ask the question again. At any time did you, or Mrs. Hiss in your presence, turn any documents of the State Department or of any other Government organization, or copies of any documents of the State Department or any other Government organization, over to Whittaker Chambers?

A. Never. Excepting, I assume, the title certificate to the Ford.

Q. In order to clarify it, would that be the only exception?

A. The only exception.

JUROR: To nobody else did you turn over any documents, to any other person?

THE WITNESS: And to no other unauthorized person. I certainly could have to other officials.

That the aforesaid testimony of the defendant, as he then and there well knew and believed, was untrue in that the defendant, being then and there employed in the Department of State, in or about the months of February and March, 1938, furnished, delivered and transmitted to one Jay David Whittaker Chambers, who was not then and there a person authorized to receive the same, copies of numerous secret, confidential and restricted documents, writings, notes and other papers the originals of which had theretofore been removed and abstracted from the possession and custody of the Department of State, in violation of Title 18, United States Code, Section 1621.

## COUNT II

\*　　\*　　\*　　\*　　\*　　\*

2. That at the time and place aforesaid the defendant Alger Hiss, duly appearing as a witness before said Grand Jurors, and then and there being under oath as aforesaid, and having been duly advised of the nature of the investigation then and there being conducted, testified falsely before said Grand Jurors with respect to the aforesaid material matter as follows:

Q. Now, Mr. Hiss, Mr. Chambers says that he obtained typewritten copies of official State documents from you.

A. I know he has.

Q. Did you ever see Mr. Chambers after you entered into the State Department?

A. I do not believe I did. I cannot swear that I did not see him some time, say, in the fall of '36. And I entered the State Department September 1, 1936.

Q. Now, you say possibly in the fall of '36?

A. That would be possible.

Q. Can you say definitely with reference to the winter of '36; I mean, say, December, '36?

A. Yes, I think I can say definitely I did not see him.

Q. Can you say definitely that you did not see him after January 1, 1937?

A. Yes, I think I can definitely say that.

MR. WHEARTY: Understanding, of course, exclusive of House hearings and exclusive of the Grand Jury.

THE WITNESS: Oh, yes.

That the aforesaid testimony of the defendant, as he then and there well knew and believed, was untrue in that the defendant did in fact see and converse with the said Mr. Chambers in or about the months of February and March, 1938, in violation of Title 18, United States Code, Section 1621.

Hiss's conviction was affirmed on appeal, *United States v. Hiss*, 185 F.2d 822 (2d Cir. 1950), *cert. denied*, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951), and he served three years of the five-year sentence imposed. In recent years, utilizing the Freedom of Information Act, 5 U.S.C. § 552, enacted in 1976, Hiss has obtained many thousands of documents from government files. On the basis of approximately one hundred and fifty of these, he now moves for a new trial by writ of error *coram nobis* asserting various claims of prosecutorial misconduct which allegedly denied him a fair trial.

These claims are: 1) a deprivation of the effective assistance of counsel guaranteed by the Sixth Amendment by reason of improper contacts between the prosecution and an investigator for Hiss; 2) the suppression by the prosecution of three statements by Whittaker Chambers; 3) the suppression of material information about the Woodstock typewriter Hiss offered in evidence on the trial; 4) the knowing use by the prosecution of perjured testimony by two government witnesses; and 5) an improper argument by the prosecutor to the jury in summation.[1] To support claim 1) above, the law requires not only a) an improper contact but also b) the communication of some valuable information giving rise to c) some realistic possibility of prejudice to Hiss. *See* p. 988, *infra.* As to the remainder of the claims the law requires factual support for each claim and a showing that but for the alleged misconduct, Hiss on the trial would probably have raised a reasonable doubt as to his guilt. *See* pp. 986–987, 994, *infra.*

A consideration of the extensive history culminating in this case is essential to a proper evaluation of Hiss's present claims, particularly since the jury had this history before it as well.

### THE HISTORY

Whittaker Chambers, while an undergraduate in college in 1924, became a member of the Communist Party. His activities over the years culminated in his becoming involved in espionage for the Soviet Union in the 1930's. This espionage work was conducted by means of an underground "cell" in Washington, D. C., the members of which included certain well-placed United States government officials. At some point, however, disillusionment set in, and in April 1938, Chambers broke with the Party, severed all ties, and went to work using his skills as a writer and publisher, to become by 1948, a senior editor of *Time* magazine.

Starting in 1939 and continuing into 1946, Chambers, concerned with what he perceived to be the continuing threat of Communism, spoke guardedly to various officials in the United States government about Communist infiltration into the government. Among those to whom he spoke were Assistant Secretary of State Adolph A. Berle, State Department security officer Raymond Murphy, and various FBI agents. In the course of these conversations Chambers stated that Alger Hiss was a Communist. By 1946, the fact that these charges were circulating had come to Hiss's attention, as acknowledged by Hiss himself in his testimony two years later before the House of Representatives' Special Subcommittee of the Committee on Un-American Activities (the "Subcommittee" or "HUAC"):

[CONGRESSMAN RICHARD M.] NIXON. You testified when you were before the committee before that in 1946, Mr. Byrnes had asked you to talk to him concerning certain allegations made by Members of Congress concerning Communist affiliations, and at that time you saw Mr. Tamm of the FBI.

Mr. HISS. I think I talked to Mr. Tamm on the telephone to get the appointment, and I rather think it was Mr. Ladd rather than Mr. Tamm whom I actually saw. . . . I told him that in the interval between my telephone call and the day when they were able to see me, which was at least 1 day later, I had been thinking of any possible basis for any such charge. I was trying to think of all the associations or the organizations that I might possibly have been connected with.

Hiss also acknowledged that the name "Whittaker Chambers" had come to his attention in 1947. First, Hiss later testified that in that year, 1947, two FBI agents had seen him "and among the list of names of people they asked me if I was acquainted with was the name Whittaker Chambers. . . . The name stuck in my memory at the moment because it sounded like a

---

**1.** A claim of unlawful electronic surveillance of Hiss was originally asserted, but on the argument it was conceded by Hiss's counsel that there was no evidence to support the claim.

distinctive and unusual name, and I said 'No.'" Second, as Hiss also later testified, it was reported to him by a friend in January or February of 1948 that "a man named Chambers on *Time* had called me, or was reported by hearsay to have said[,] I was a Communist." The friend also reported to Hiss that upon checking, he was informed that "Chambers on *Time* . . . was not saying anything of the kind at that time."[2]

It was not, however, until some four or five months later, on August 3, 1948, that Chambers, in testimony before the Subcommittee, first publicly named Alger Hiss as a Communist, confining his remarks to statements that Hiss was a member of

> an underground organization of the United States Communist Party . . . . The purpose of this group at that time was not primarily espionage. Its original purpose was the Communist infiltration of the American Government. But espionage was certainly one of its objectives.

These public charges received instant and widespread notoriety, and Hiss—at that time President of the Carnegie Foundation for Peace, a graduate of the Harvard Law School, former law clerk to United States Supreme Court Justice Oliver Wendell Holmes, former advisor to President Franklin Roosevelt, and former Secretary General of the San Francisco United Nations Conference—requested and received the right to appear before the Subcommittee to dispute the charges. He did appear on August 5, 1948, denied any Communist Party affiliation whatsoever, denied knowing Whittaker Chambers,[3] and could not recognize a recent photograph of him.[4] Hiss stated:

> I would much rather see the individual. I have looked at all the pictures I was able to get hold of in, I think it was, yesterday's paper which had the pictures. If this is a picture of Mr. Chambers, he is not particularly unusual looking. He looks like a lot of people. I might even mistake him for the chairman of this committee. [Laughter.]

[CONGRESSMAN KARL E.] MUNDT. I hope you are wrong in that.

Mr. HISS. I didn't mean to be facetious but very seriously, I would not want to take oath [sic] that I have never seen that man. I would like to see him and then I think I would be better able to tell whether I had ever seen him.

Hiss did not, however, immediately get his demanded confrontation. There intervened a second session with the Subcommittee on August 16, 1948. Hiss, by this time realizing that his accuser had testified in some detail as to his (Hiss's) personal life and family, described with some tentativeness,[5] his recollection of a man "—and he may have no relation to this whole nightmare—. . . named George Crosley," whom Hiss identified as a free-lance writer he had known in 1934 and 1935. Hiss said that "Crosley" and his family had stayed at his

---

**2.** It is at the least puzzling that Hiss apparently did nothing to follow up on this at this time.

**3.** He acknowledged hearing the name from the FBI, but otherwise said "[t]he name means absolutely nothing to me . . . ." At the next session before the Subcommittee, Hiss also denied knowing Chambers under the name "Carl" which is how Chambers had testified he was known to Hiss.

**4.** Chambers was apparently heavier in the recent photograph than at the time Hiss had known him.

**5.** Hiss testified as follows:

> Mr. HISS. I have written a name on this pad in front of me of a person whom I knew in 1933 and 1934 who not only spent some time in my house but sublet my apartment.

> That man certainly spent more than a week, not while I was in the same apartment. I do not recognize the photographs as possibly being this man.

> \* \* \*

> Mr. HISS. I can't believe, Mr. Nixon, that anyone could have stayed in my house when I was there . . . overnight on several occasions without my being able to recall the individual; and if this is a picture of anyone, I would find it very difficult to believe that that individual could have stayed in my house when I was there on several occasions overnight and his face not be more familiar than it is.

(The quotations in this note and notes 6 and 7 are taken from Hiss's testimony on the second trial.)

home for several days.[6] Hiss further said that he sublet an apartment to "Crosley" for a number of months with free gas, electricity and phone;[7] furnished him with a car for two months and took care of it thereafter when "Crosley" was not using it;[8] and said that he had driven "Crosley" once from Washington to New York in his car.[9] Hiss repeated his demand to see Chambers and to hear his voice.

The demanded confrontation between Hiss and Chambers finally took place on August 17, 1948, and proceeded thus:

Mr. NIXON. Mr. Hiss, the man standing here is Mr. Whittaker Chambers. I ask you now if you have ever known that man before.

Mr. HISS. May I ask him to speak? Will you ask him to say something?

Mr. NIXON. Yes, Mr. Chambers, will you tell us your name and your business?

Mr. CHAMBERS. My name is Whittaker Chambers. (At this point, Mr. Hiss walked in the direction of Mr. Chambers.)

Mr. HISS. Would you mind opening your mouth?

6. Hiss testified as follows:
 Q. And in the evening I dare say you saw [them] on two or three evenings, depending upon the number of evenings they stayed?
 A. Yes. We fed them while they were there.

7. Hiss testified as follows:
 Q. We are going over these things separately now. We are agreed that you paid for the rent that you were obligated to pay?
 A. Right.
 Q. That you gave him the use of the furniture for which you did not charge?
 A. Yes.
 Q. You also paid and he did not assume to pay the cost for the electricity and for the gas?
 A. That is my best recollection after all these years.
 Q. And can we add to that the cost of the phone?
 A. Yes.

8. Hiss testified as follows:
 Q. Didn't you tell us that you gave [him] the car in the fall of 1935?
 A. He took it for about two months then and brought it back, and it stayed in Georgetown all that winter.
 * * * * * *

Mr. CHAMBERS. My name is Whittaker Chambers.

Mr. HISS. I said, would you open your mouth? You know what I am referring to, Mr. Nixon. Will you go on talking?

Mr. CHAMBERS. I am senior editor of Time magazine.

Mr. HISS. May I ask whether his voice, when he testified before, was comparable to this?

Mr. NIXON. His voice?

Mr. HISS. Or did he talk a little more in a lower key?

[CONGRESSMAN JOHN] McDOWELL. I would say it is about the same now as we have heard.

Mr. HISS. Would you ask him to talk a little more?

Mr. NIXON. Read something, Mr. Chambers. I will let you read from—

Mr. HISS. I think he is George Crosley, but I would like to hear him talk a little longer.... Are you George Crosley?

Mr. CHAMBERS. Not to my knowledge. You are Alger Hiss, I believe.

Mr. HISS. I certainly am.

 Q. Parked on the street?
 A. And [I] kept [it] in running order and so on. I would start it in the winter and keep the battery from going down and get the tires pumped up every now and then, and things of that sort.

9. Hiss testified as follows:
 Q. And can you recall what the occasion for the trip was?
 A. Well, my recollection is that I had told [him] at luncheon or some other occasion that I was going to New York and would be driving myself in any event, and he asked if he might go along, and I said I would be glad to have him come along.
 * * * * * *
 Q. Can you recall what the general subject matter was or subject matters that you and [he] discussed on your ride up to New York?
 A. Just the casual conversation you would have with anybody you were giving a lift or a ride to.
 Q. Casual for five or six or seven hours?
 A. Yes. It is a long trip.

Mr. CHAMBERS. That was my recollection.

\* \* \* \* \* \*

[COMMITTEE INVESTIGATOR] STRIPLING. You were going to read.

Mr. CHAMBERS (reading from Newsweek magazine):

"Tobin for Labor. Since June, Harry S. Truman had been peddling the labor secretaryship left vacant by Lewis B. Schwellenbach's death in hope of gaining the maximum political advantage from the appointment."

Mr. HISS. May I interrupt?

Mr. McDOWELL. Yes.

Mr. HISS. The voice sounds a little less resonant than the voice I recall of the man I knew as George Crosley. The teeth look to me as though either they have been improved upon or that there has been considerable dental work done since I knew George Crosley, which was some years ago.

\* \* \* \* \* \*

I believe I am not prepared without further checking to take an absolute oath that he must be George Crosley.

Chambers then stated that he had had substantial dental work, whereupon the following transpired:

Mr. HISS. Could you ask him the name of the dentist that performed this thing? Is that appropriate?

Mr. NIXON. Yes. What is the name?

Mr. CHAMBERS. Dr. Hitchcock. Westminster, Md.

Mr. HISS. That testimony of Mr. Chambers, if it can be believed, would tend to substantiate my feeling that he represented himself to me in 1934 or 1935 or thereabout as George Crosley, a freelance writer of articles for magazines.

I would like to find out from Dr. Hitchcock if what he has just said is true, because I am relying partly, one of my main recollections of Crosley was the poor condition of his teeth.

\* \* \* \* \* \*

Mr. NIXON. Before we leave the teeth, do you feel that you would have to have the dentist tell you just what he did to the teeth before you could tell anything about this man?

\* \* \* \* \* \*

Mr. HISS. I am not able ... to take an oath that this man is George Crosley. I have been testifying about George Crosley. Whether he and this man are the same or whether he has means of getting information from George Crosley about my house, I do not know. He may have had his face lifted.... Did you ever go under the name of George Crosley?

Mr. CHAMBERS. Not to my knowledge.

Mr. HISS. Did you ever spend any time with your wife and child in an apartment on Twenty-ninth Street in Washington when I was not here because I and my family were living on P Street?

Mr. CHAMBERS. I most certainly did.

\* \* \* \* \* \*

Mr. NIXON. The question, Mr. Chambers, is, as I understand it, that Mr. Hiss cannot understand how you would deny that you were George Crosley and yet admit that you spent time in his apartment.

\* \* \* \* \* \*

Mr. CHAMBERS. As I have testified before, I came to Washington as a communist functionary, a functionary of the American Communist Party. I was connected with the underground group of which Mr. Hiss was a member. Mr. Hiss and I became friends. To the best of my knowledge, Mr. Hiss himself suggested that I go there, and I accepted gratefully.

Mr. HISS. Mr. Chairman.

Mr. NIXON. Just a moment. How long did you stay there?

Mr. CHAMBERS. My recollection was about 3 weeks. It may have been longer. I brought no furniture, I might add.

Mr. HISS. Mr. Chairman, I don't need to ask Mr. Whittaker Chambers any more questions. I am now perfectly prepared to identify this man as George Crosley.

Up to this time Chambers had never told the Subcommittee or anyone else that Hiss had been involved in any form of espionage or obtaining United States government documents for delivery to the Soviet Union. Chambers had limited his accusation to that of Communist affiliation. *See* p. 978, *supra.* Following the confrontation, and apparently in light of this limited accusation, Hiss demanded that Chambers repeat the charge outside of the "privileged" Subcommittee hearings so that Hiss could sue him for defamation. Chambers did repeat his charge in nonprivileged circumstances, and Hiss commenced a libel action against him in the United States District Court in Baltimore. There, in the course of taking Chambers's pretrial testimony, Chambers was asked whether he had received any correspondence or documents from Hiss. Chambers responded affirmatively and the following day, November 17, 1948, produced four handwritten notes and sixty-five typewritten pages. These documents, Hiss was to acknowledge, were either summaries or copies of the entirety of War Department and State Department documents of some consequence stemming from the period January to March, 1938. Hiss at a later point also conceded that the handwritten notes were in his hand [10] and admitted that most of the typewritten documents (which came to be called the "Baltimore documents") were typed on the Woodstock typewriter belonging to Mrs. Hiss which had been in their apartment for a number of years.[11] These documents were forthwith turned over to the United States Department of Justice,[12] and a grand jury investigation was commenced in the Southern District of New York.

Chambers's disclosure of the documents and the fact that the Hisses had disposed of the typewriter a number of years earlier [13] led both the FBI and Hiss's counsel to bend every effort to find it. The government sought the typewriter to corroborate Chambers's story. Hiss's counsel, on the other hand, sought the typewriter to support the Hisses' later explanation that they had given the typewriter to a former maid, Claudia Catlett, and her children prior to the earliest date of any of the Baltimore documents, and that, consequently, neither Mr. nor Mrs. Hiss could have copied the documents as

---

**10.** As to recognizing one of them he needed some assistance:

> Q. At what point prior to the trial did you become reasonably sure that that document was in your handwriting?
>
> A. I could not fix the exact date, but some time in the course of preparation for the first trial.
>
> Q. Well, what facts did you have which made you reasonably sure?
>
> A. Well, I asked a handwriting expert what he thought it was, and he showed me an enlargement of it, and once it was enlarged I had no doubt that it was my handwriting; I could see it; but in its original form it still does not look like it.

**11.** Hiss's lawyer was to state at the second trial:

> I am going to speak now of the typewriter. The Government expert said that in his opinion these Baltimore exhibits were typed on the [Hisses'] Woodstock typewriter. Undoubtedly that is a good opinion. As I told you in the opening, we consulted experts, and in their opinion they thought so too. But it is not the question of what was used but who the typist was.
>
> Hiss had earlier testified in the grand jury as follows:

> Q. To go back to my question. I would like you to state to the grand jury any possible explanation that you might have for the possibility of anybody having access to that typewriter, that Woodstock typewriter, during the period of 1937 and 1938?
>
> A. Quite frankly, the only explanations I have been able to think of, Mr. Donegan, are [Chambers] having got entry to my house, his having bribed a servant in order to get access to the typewriter, or our having disposed of it earlier than our recollection is, and he somehow having found that out. I do not know of any other explanation.

**12.** Chambers later turned over to HUAC certain undeveloped rolls of microfilm which he had also kept. The developed film included pictures of three State Department cables bearing, Hiss later was to acknowledge, Hiss's initials in his own hand.

**13.** Initially Hiss told the FBI that the typewriter had been in his home "from 1936 to some time after 1938" and that Mrs. Hiss had thereafter disposed of it "to either a second-hand typewriter concern or a second-hand dealer in Washington, D. C."

Chambers claimed. It followed, Hiss was later to urge, that one of Chambers's confederates must have located the typewriter at the maid's home [14] and surreptitiously used it to copy the State Department documents which, Hiss claimed, Chambers had gotten from persons other than Hiss.

Since both sides were seeking the typewriter, one of Hiss's leading counsel, Edward McLean,[15] concluded that cooperating and keeping in touch with the government in the search was in the best interests of his client.[16] Consequently, there was a number of contacts between McLean and his staff and the FBI during this time, not only with regard to the search, but also with respect to other subjects, including Hiss's furnishing the FBI with samples of typing from the machine.[17]

On December 15, 1948, however, the situation changed, for the grand jury, which had heard testimony from a number of witnesses over a month, including Mr. and Mrs. Chambers and Mr. and Mrs. Hiss, indicted Hiss on two counts of perjury. The indictment, as recited earlier, alleged in essence that Hiss had given false testimony that 1) neither he nor Mrs. Hiss delivered any copies or summaries of State Department documents to Whittaker Chambers and 2) that he definitely had not seen Chambers after January 1, 1937.

It is appropriate to note at this point that notwithstanding Hiss's present claim that the prosecution had all the advantages in its preparation for trial, it was, in fact, Hiss who located the typewriter. Further, I observe, that following the indictment, Hiss, pursuant to an unusual ruling by the Maryland District Court, was permitted to continue deposing Chambers, now having a full awareness of the Government's criminal charges and thus being able to focus the questioning accordingly. Consequently, Chambers was further questioned for two full days by McLean on, among other things, the circumstances surrounding Chambers's receipt of the documents. Hiss was also given unrestricted access to the Government's documentary evidence, and thus came to his trial having had a rare and unrestricted exploration of the heart of the prosecution's case.

## THE TRIALS

The first trial took place between May 31 and July 7, 1949 and ended in a jury disagreement. The second trial commenced on November 17, 1949 and concluded with a conviction on both counts on January 25, 1950.

Chambers testified at both trials essentially as follows: In June or July, 1934, he was introduced to Hiss by J. Peters, head of the American Communist Party underground, and Harold Ware, the principal of a

14. Hiss's lawyer so argued in summation on the second trial:
 I say, well, how did Chambers know about that? How did he get it? Anybody? He did not do it himself, you can bet your life on that. He gets through confederates, anybody who can get through confederates and steal top secret documents from the State Department would not have much trouble locating a big office typewriter. Now I can suggest there might be several ways. I can suggest a way that he could have easily found out. Suppose someone had called up, or come over, when he knew the Hisses weren't there, and asked Clidi, [the Hisses' maid] saying that they were a typewriter repair man and had come to repair the Woodstock typewriter. What would she have said: "Why, they have given it to my boys." He wouldn't have much difficulty locating Clidi's place, and with that open house, with the cellar there, I mean the closet; with all the people coming and going, all the people living there, and their friends, and the dances and all. How easy. Am I talking through my hat? Have I got any basis for that?

15. Both McLean and the chief prosecutor, Thomas F. Murphy, became judges of this Court. Judge McLean is now deceased. Judge Murphy is today on senior status.

16. McLean expressed his view of the importance of locating the Woodstock typewriter when, on April 16, 1949, it was finally located in the possession of a junkman, Ira Lockey. McLean, in buying it said, "If this is the typewriter, it will probably save a man from [a] jail sentence."

17. Hiss, himself, acknowledged the fact of this cooperation during his testimony at the second trial.

secret Communist organization in Washington, D. C. It was agreed at that time that Hiss was to be "disconnected" from Ware's "apparatus" and become a member of a parallel organization which Chambers was charged with organizing. At first, Hiss, who was then counsel to the Nye Committee, which was investigating the munitions industry, furnished Chambers with copies of confidential State Department documents.[18] Later, in early 1937, when Hiss joined the State Department, every seven or ten days he surreptitiously removed important documents and brought them to his home where Chambers picked them up, took them to Baltimore for photocopying, and returned them to Hiss that same night. This practice continued until the middle of 1937, at which time the plan changed and Hiss began taking State Department documents on a daily basis to be copied on a typewriter,[19] either verbatim or in substance. Every ten days or so Chambers picked up the typewritten documents as well as Hiss's handwritten notes about other documents which Hiss had examined.[20] Chambers took this material to Baltimore for photocopying and then turned over the films and on some occasions the handwritten notes to one Colonel Bykov, a Soviet spy. This continued from mid-1937 until April, 1938, when Chambers finally broke with the Communist Party. It was at that time that he retained and hid the so-called "Baltimore documents" in his wife's nephew's unused dumbwaiter shaft in a Brooklyn apartment house.

In addition, Chambers testified to his family's stay at the Hisses' home, the sublet of Hiss's apartment and the use of the car. *See* pp. 978–979, *supra.* He also testified concerning his and his wife's personal friendship with the Hisses, which included not only the trip to New York City, *supra,* but other trips to Erwinna, Pennsylvania, Long Eddy, New York, and Peterboro, New Hampshire. Mrs. Chambers corroborated her husband's testimony by testifying at great length about their social acquaintance with the Hisses.

During both trials Chambers was subject to rigorous cross-examination on his credibility and motivation, with minute probing of numerous contradictory prior statements made by Chambers regarding Hiss's Communist affiliation, Hiss's espionage activities, and his own involvement with the Hisses—much of which was either under oath before HUAC or in the libel case or before the grand jury.

Hiss, on the trial, utterly denied being a Communist and all of Whittaker Chambers's other charges, including the transmission of documents:

Q. Mr. Hiss, I show you what has been referred to as Baltimore Exhibits 1 to 4. Are those in your handwriting?

A. They are.

Q. Did you ever give those to Whittaker Chambers?

A. I did not.

Q. Did you ever give them to any person unauthorized to receive such documents?

A. I did not.

Q. I show you Baltimore Exhibits 5 to 47, and I will ask you if you ever delivered a single one of those papers to Whittaker Chambers?

A. I did not.

Q. Or to anyone else who was not authorized to receive documents?

A. I never delivered these to anybody.

Q. Did you ever see those before?

A. I have never had these papers in my hand until just now.

---

18. One Julian Wadleigh, an official in the Trade Agreements Division of the State Department—and a prosecution witness on the trial—also furnished Chambers with State Department documents.

19. The plan, according to Chambers, was for Mrs. Hiss to type them.

20. Relevant to an issue raised by Hiss on this motion is the fact that on cross-examination Chambers testified at some length about also receiving stolen State Department papers from Julian Wadleigh, in the period 1936 through 1938, and mentioning him to Berle—but not the FBI—in the period 1939 through 1946. *See* pp. 989–991, *infra.*

Q. And were these documents ever typed in your house by Mrs. Hiss or by anyone else, to your knowledge?

A. They were not typed in my house nor by Mrs. Hiss. I have no idea where or how they were typed.

Hiss testified that he knew Chambers as "Crosley," see pp. 978–980, supra, and while acknowledging the subletting of the apartment and furnishing the car, etc., testified to an otherwise very limited relationship. Both he and his wife denied most of the extensive social relationship that Chambers and his wife had described in their testimony. Hiss testified that the last time he had seen Chambers prior to the 1948 HUAC confrontation was in May or June of 1936.

The defense trial strategy, it appears, was to contrast Chambers, the Communist, atheist, fornicator, Soviet espionage agent, with—as Hiss's counsel argued in summation at the first trial—

Alger Hiss, a brilliant young member of the State Department; everywhere he has been and everywhere he has gone and everything he has done and every trail that he has left behind is pure, wholesome, sound, clean, decent, fine.

Chambers's testimony, however, was corroborated in many critical areas by unassailed, independent evidence, much of it documentary.

The single most damaging corroboration—made even more damaging because Hiss conceded its truth—was the testimony of Felix Feehan, a document examiner employed by the FBI. His testimony was based upon his comparison of the "Hiss standards," [21]—four documents concededly typed by Mrs. Hiss on the Hisses' Woodstock machine—with the "Baltimore documents," which Chambers had produced at his deposition in the libel action and which he testified had been given him by Hiss.

This document comparison caused Feehan to conclude and, in substance, testify at both trials that "the same machine was used to type Baltimore Exhibits 5 through 9 and 11 through 47 that was used to type the [Hiss] standards . . . ." As observed above, Feehan's conclusion not only was not challenged by Hiss but, indeed, Hiss's counsel at his second trial, conceded both in his opening statement and in summation that the experts retained by the defendant agreed with Feehan's conclusion.[22] See n.11, supra.

Also obviously highly damaging to Hiss's case was Chambers's possession of four notes in Hiss's hand and the film of three State Department cables bearing, Hiss conceded, his handwritten initials.[23]

21. The Hiss "standards" consisted of: a letter addressed to one Mr. Hillegeist, Director of Admissions, University of Maryland; a letter dated June 12, 1937 to Miss Hellings, Free Library, Philadelphia; Report of the President of Bryn Mawr Alumnae Association of Washington, D. C. for the year 1936–1937; and a memorandum dated September 9, 1936 entitled "Description of Personal Characteristics of Timothy Hobson".

22. Hiss claims that Feehan's testimony was "truncated" in order to avoid problems with the date of manufacture of the typewriter. I note, however, that at the time of Feehan's testimony on the first trial, the Woodstock typewriter, serial # 230,099, later defendant's Exhibit UUU at trial, was in the possession of Hiss's counsel, and was not available to the prosecution. The Government had had no opportunity to inspect the machine or take typing samples from it for comparison with the Baltimore documents or the Hiss "standards." It was not until the period between the first and second trials that an order was signed permit-

ting the Government to take specimens from Exhibit UUU. It is of course significant that the FBI laboratory concluded that Exhibit UUU was in fact used to type both the Baltimore documents and the Hiss standards. Feehan did not, however, expand his testimony to include this for understandable reasons. See p. 996, infra.

23. See n. 10, supra. Hiss claimed that he made such notes for the purpose of conferring with his superior, Francis Sayre, and suggested that they were stolen from his desk or wastepaper basket. According to Hiss's secretary's testimony, however, theft was next to impossible given existing security precautions. Sayre, too, undercut this story, testifying that he had no recollection of Hiss writing notes similar in form to the four Chambers possessed, that they "differed markedly" from others which Hiss had prepared for him, and that the subject matter of one of the four handwritten notes had no relationship to either his or Hiss's areas of concern at the State Department.

Other highly damaging matters were Hiss's possession of an oriental rug which he admitted he had been given by "Crosley" and the fact of a certain $400 loan to which Chambers testified and which Hiss denied.

With respect to the oriental rug, Chambers testified that it was one of four he purchased in approximately December, 1936, on instructions from Colonel Bykov, the Russian espionage agent, and that it was given to the Hisses as a "gift from the Soviet people in recognition of the work of the American Communists." [24]

The Hisses admitted receipt of the rug. There was a record of storage payments for the rug in the Hisses' checkbook, and members of the Catlett Family, Hiss's principal witnesses respecting relinquishment of the Woodstock typewriter, see p. 995, infra, recalled seeing it. Hiss stated, however, that the rug had been given to him as "part payment" or a "gift" since Chambers ("Crosley") had not paid rent as promised on the sublease of their Twenty-eighth Street apartment. According to Hiss, "Crosley" had received the rug from a wealthy patron.

Chambers's version of the circumstances concerning the rug was corroborated, however, by Professor Meyer Shapiro, a noted professor of art history at Columbia University, who testified that Chambers asked him to purchase four such rugs and arrange for their delivery to Silverman in Washington, D. C. Shapiro's testimony was, in turn, corroborated by the testimony of one Edward Touloukian, an employee of the import company through which the four rugs were purchased.

As to the loan transaction, Chambers testified that in November, 1937, in preparation for his break with the Communist Par-

ty, he borrowed $400 in cash from the Hisses which he used to purchase an automobile. Chambers's use of such an amount of cash for the purchase of a car at that very time was verified by the records of the dealer from which the car was purchased, and the records of Hiss's bank reflected a withdrawal of $400 from Hiss's account four days prior to Chambers's purchase of the automobile.[25]

Corroboration of Chambers's testimony of a close social relationship with the Hisses came from the fact that Chambers purchased a certain Westminster, Maryland farm which Hiss previously had had under contract. According to Chambers, Hiss drove him to and showed him the Westminster farm in early 1935 at a time when Hiss intended to buy it. When Hiss withdrew from the deal, however, Chambers went ahead and bought the property himself. Hiss acknowledged that during April and May 1936, he had indeed negotiated for the purchase of the farm. He denied, however, taking Chambers to the farm, and, when asked if he had mentioned the negotiations to Chambers, he said, "I don't remember doing so. I certainly might have." The "coincidence" that Chambers, with whom Hiss denied any sort of a close relationship, could independently have learned of the availability of this very farm for later purchase was a most damaging one.

There was also independent testimony of the Hisses' visits to the Chambers residence. Edith Murray, the Chamberses' family maid in 1935 and 1936, testified to having seen Mrs. Hiss on several occasions and Mr. Hiss on one occasion at the Chambers residence at 1617 Eutaw Place, Baltimore, Maryland. In view of Hiss's firm denials of ever hav-

---

**24.** Wadleigh, as mentioned earlier, another source of State Department documents for Chambers, testified that in the last week of December, 1936, he, too, received an oriental rug from his principal "contact" in the Soviet underground.

**25.** Hiss and his wife claimed that the $400 withdrawal was to facilitate the purchase of household goods for a house they purchased at Volta Place, Washington, D. C. The prosecu-

tion proffered evidence, however, that at the time of the alleged purchases, 1) the Hisses had not closed the real estate transaction involving Volta Place, 2) they maintained checking accounts and credit charges in the major Washington, D. C. stores and thus had no need for $400 in cash to make the purchases claimed, and 3) these alleged cash purchases were at odds with their financial habits and practices.

ing been at any of Chambers's residences, this testimony, too, was highly damaging.

On the foregoing and other evidence, the jury found Hiss guilty on both counts of the indictment. In affirming the conviction, the Court of Appeals for the Second Circuit wrote:

> The jury might well have believed that the appellant had been less than frank in his belated recognition of Mr. Chambers as a man he had known as Crosley and had admittedly known well enough to provide for him a partly furnished apartment at cost with all utilities free to say nothing of an automobile, old certainly, but still useful. The jury had ample evidence other than the testimony of Mr. Chambers on which to find, as it evidently did, that the documents of which Mr. Chambers produced copies were all available to Mr. Hiss at the State Department and that finding, coupled with the admitted fact that they were copied on a typewriter which the jury could well find was used for that purpose when in the possession of Mr. Hiss in his home, supplied circumstances which strongly corroborated the testimony of Mr. Chambers. Indeed, such known circumstances tend to fill out a normal pattern of probability when so interpreted, while in attempting to reconcile them with the appellant's denial of association with the delivery of State Department documents, or their copies, to Mr. Chambers, one approaches the realm of sheer speculation. To the prosecution's theory that the appellant abstracted these copied documents and took them home where they were copied on a typewriter which the jury could, and doubtless did, find was then in his home, the only possible alternative is that one or more others abstracted them (for there is not the slightest evidence or suggestion that this Woodstock typewriter was ever in the State Department) and then took what pains were needed to copy them, or have them copied, on that particular typewriter either at the Hiss home or elsewhere on some later date and, if at the Hiss home, unbeknown to Mr. or Mrs. Hiss. Obviously that would have entailed some risk of detection by the Hisses which the use of some other means of copying would not have involved. It seems abundantly clear that the jury was amply justified in believing that these circumstances did not indicate some ulterior motive to harm the appellant at some future date but in believing that they pinned the abstractions and deliveries fast to the appellant himself. The foregoing is an attempt not to summarize the mass of evidence introduced at the trial below, but only to show, as we think it does, that there was independent evidence sufficient as a matter of law, if believed and so considered by the jury, to substantiate the testimony of Mr. Chambers in compliance with the rule in perjury cases as to both counts. *United States v. Hiss, supra,* 185 F.2d at 830.

The Supreme Court thereafter denied *certiorari,* 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951).

## THE WRIT OF ERROR *CORAM NOBIS*

■ The writ of error *coram nobis* which Hiss now seeks is an extraordinary remedy to be allowed "only under circumstances compelling such action to achieve justice." *United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954). Its purpose is to correct errors "of the most fundamental character." *United States v. Mayer,* 235 U.S. 55, 69, 35 S.Ct. 16, 19, 59 L.Ed. 129 (1914). This is necessarily so, for obviously issuance of the writ is tantamount to acquittal. *United States v. Keogh,* 440 F.2d 737, 741 (2d Cir. 1971). The government has little if any interest in reprosecuting a defendant who served his sentence more than 25 years ago. Indeed, with Whittaker Chambers, the principal witness for the government, dead, reprosecution appears a virtual impossibility.

■ The burden of overcoming the presumption that the original proceedings were correct rests with Hiss, *United States v. Morgan, supra,* 346 U.S. at 512, 74 S.Ct. at 253, and the mere fact that Hiss has made certain allegations does not automatically entitle him to an evidentiary hearing. Such may be accorded only where the

petition alleges *facts* which would support a claim of deprivation of constitutional right . . . and some material issue of fact is in dispute.

*United States v. Tribote*, 297 F.2d 598, 600 (2d Cir. 1961) (emphasis supplied).

## HISS'S ALLEGED DEPRIVATION OF THE EFFECTIVE ASSISTANCE OF COUNSEL

■ Hiss first attacks his conviction on the ground that he was "deprived of the effective assistance of counsel guaranteed to him under the Sixth Amendment." He bases this claim on the fact that *after* December 15, 1948, the date of Hiss's indictment, Horace Schmahl, an investigator hired by McLean, had one contact with the FBI and one contact with prosecutor Thomas F. Murphy.[26] In each of these contacts [27] Schmahl related information about an area the defense was investigating.

The first such contact was a phone call by Schmahl to Agent Shannon of the FBI advising Shannon of McLean's *new* request to Schmahl to investigate an application for credit made by Mrs. Chambers. The second contact was Schmahl's statement to the chief prosecutor that the defense had attempted to locate an old Woodstock typewriter and had specifically inquired about such at the firm of Adam Kunze in New York City. Murphy, it appears, asked the FBI to verify this.

In the first instance, these "intrusions" must be viewed against the substantial history of authorized cooperation between the defense and the government which McLean was fostering in the three-month period prior to indictment,[28] on numerous subjects such as finding the Hisses' Woodstock. *See* p. 982, *supra.*

Second, the two post-indictment contacts of which Hiss now complains concerned the same subject matters as to which Schmahl had been authorized to talk to the government prior to the indictment. Thus, Schmahl had spoken to the government on December 11, 1948, about the defense's investigation of Mrs. Chambers's alleged use of another person's name to get credit in stores, and an FBI memorandum dated December 8, 1948, reveals that the Bureau had spoken with Schmahl on the subject of locating specimens of typing from Hiss's typewriter. The memorandum goes on to state that the Bureau preferred to deal with McLean rather than Schmahl because of the Bureau's sensitivity to the importance of "avoid[ing] any difficulty over his [Schmahl's] activity." Schmahl, it seems, was an investigator whose tactics were known to the Bureau to be questionable. It appears that in the course of his work he was misrepresenting his relationship to the FBI, and thus wished to maintain close contact with the FBI for personal reasons. This was itself troublesome to the Bureau.[29] The Bureau, on the other hand, was reluctant to cut off contacts with Schmahl completely because he was providing possibly valuable information to it on other unrelated cases.

In any event, Hiss has raised no serious question as to the Bureau or the prosecutor's office *seeking* to take improper advantage of Schmahl's role as a go-between. But of even more critical importance is the fact that the information that Schmahl communicated during the period of preparation for the first trial could not have had

---

26. Hiss implicitly acknowledges both that pre-indictment contacts were authorized and that prior to indictment there is no Sixth Amendment right to counsel into which the prosecution could have "intruded," *Ostrer v. Aronwald*, 434 F.Supp. 379 (S.D.N.Y.), *aff'd* 567 F.2d 551 (2d Cir. 1977).

27. Whether, as Hiss asserts, there were more contacts than these two is, on the record before me, only speculation.

28. This is in the very same time period that Hiss, himself, with his counsel's approval, submitted to extensive questioning by the FBI.

29. Schmahl, to the Bureau's knowledge, falsely represented himself on more than one occasion as being associated with the FBI, or "an ex-FBI man."

the slightest impact on the outcome of the second trial.[30]

■ Before a judgment of conviction can be vacated on the ground of improper contact between the prosecution and the defense, two determinations must be made: first, that a Sixth Amendment violation occurred, and second, that

> there [was] some communication of *valuable information* derived from the intrusion to the prosecutor or his staff in order that there can appear some *realistic* possibility of prejudice to the defendant. (emphasis supplied).

*Klein v. Smith*, 559 F.2d 189, 197 (2d Cir.), cert. denied, 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977). *See Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

In this case no valuable information having been communicated, there could not conceivably have been any realistic possibility of prejudice to Hiss, particularly in light of the standard to be applied on *coram nobis.* [31]

## THE ALLEGED SUPPRESSION OF THREE "STATEMENTS" OF CHAMBERS

Hiss next contends that the prosecutor suppressed three "statements" by Chambers [32] which, had Hiss been furnished

---

**30.** Hiss's reference to Schmahl's having "turned over the results of his investigation..." confidentially to an administrative assistant to the United States Attorney as stated in a September 22, 1949 memorandum, not only fails to state what was turned over, but as revealed by the FBI interview of Schmahl of December 11, 1948, clearly refers to an authorized pre-indictment turnover. *See* p. 982, *supra.*

**31.** A six-sheet defense document dated December 28, 1948—thirteen days after the indictment—entitled "Outline of Investigation" was found in the prosecution's files. There is no showing as to how or when it got there. There is no evidence that Schmahl furnished it. One third of its items have to do with the typewriter and samples of Hiss's typing which were the subject of earlier extensive cooperation between Hiss's counsel and the government. The balance lists further areas of inquiry obvious to anyone then familiar with the case. The document contains nothing that could have been construed as truly prejudicial. Moreover, assuming that this and other transmittals of information were indeed both improper and prejudicial, a government intrusion into the defense camp simply "invalidates the trial at which it occurred." *Caldwell v. United States*, 205 F.2d 879, 881 (D.C.Cir.1953); *Coplon v. United States*, 191 F.2d 749, 759 (D.C.Cir.1951). No transmittal of information occurred which could have affected the second trial. Thus, "if the [first] trial had resulted in a conviction instead of a hung jury, the conviction would presumptively have been set aside ...," *Hoffa v. United States*, 385 U.S. 293, 307, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966), and the remedy for a violation would have been a second trial. But Hiss *had* a second trial, well subsequent to the events about which Hiss complains of above and all of which occurred prior to the *first* trial.

**32.** Hiss's claim that the prosecutor suppressed the subject materials by stating at the second trial, "no statements were made by this witness," is a gross distortion of what actually occurred. In context that statement reads:

> Mr. MURPHY: Your Honor, as I understand the witness's testimony there were no statements made by this witness.
> Mr. CROSS: I understand that the F.B.I. have [sic] two statements.
> Mr. MURPHY: Shall we ask the witness again whether he gave a statement? As I understand [it,] he said he did not give a statement.
>
> * * * * * *
>
> Mr. CROSS: There were certain statements produced at the first trial, one dated May 14, 1942, and the other dated June 26, 1945, statements taken, as I understand, by the F.B.I. and were submitted to the Court at that time. Those are the two that I am asking for.
> Mr. MURPHY: For the record, your Honor, there are no statements by this witness for that time. I think what Mr. Cross is referring to are two F.B.I. reports written by an agent, some of which concern statements made by this man to an agent orally. If Mr. Cross wants me to submit to your Honor F.B.I. reports concerning those statements, I believe, one, I have no objection to showing them to your Honor; two, I believe defense counsel should not see them because they are not statements of the witness. They are official F.B.I. reports.
> The COURT: If I understand correctly this witness made no statements. These are really reports by the F.B.I. agents, if I understand.

Further, the prosecutor at the time of turnover added:

> Mr. MURPHY: Your Honor, so that the record can be quite accurate I am handing

them, would have enabled him to "decimate the prosecution's case and its star witness, Chambers." The three "statements" are 1) a 184-page draft of a statement prepared by the FBI from their interviews of Chambers between January 3 and April 18, 1949, 2) an FBI report dated March 28, 1946, reciting an interview that day of Chambers, and 3) an undated handwritten statement by Chambers, obviously written after the indictment and turned over to the FBI on February 15, 1949 on the subject of his homosexuality.

From the denial of the 184-page statement Hiss claims he was deprived of knowledge of the following contradictions of Chambers's testimony: 1) that the Hiss loan for the car was $500, not $400, and 2) the fact of a recital to the FBI of numerous contacts with Julian Wadleigh, which, recital he claims, Chambers denied on the trial. From the 1946 FBI report Hiss claims he was deprived of additional prior statements by Chambers 1) that he, Chambers, had no evidence of Hiss's espionage, and 2) that he, Chambers, left the Communist party in 1937. Finally, from the handwritten statement Hiss claims he was deprived of Chambers's acknowledgement that he was a homosexual which Hiss claims his counsel could have used to "illustrate [to the jury] the self-torture which Chambers's perception of his homosexuality caused him and the impact this had on his relationship with individuals including Hiss . . . ."

■ Before considering these contentions, two threshold observations need to be made. First, the law regarding the production of a statement by a witness was quite different in 1950 than it is today. Both of Hiss's trials antedated *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and the Jencks Act, 18 U.S.C. § 3500 (1957), which now requires the prosecution to turn over to the defense any "statement" [33] by a witness to the extent that its contents "relates to the subject matter of the testimony [on direct examination] of the witness." [34] At the time of the Hiss trials, however, the applicable rule was that a defendant had to establish—usually by cross examination—that a witness had theretofore made a *signed* statement containing a material contradiction. Upon such a showing the court would examine the statement *in camera*, to determine if it did in fact contain such a material contradiction. If it did, the relevant part would be turned over to defense counsel for further cross examination. *Gordon v. United States*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); *United States v. Krulewitch*, 145 F.2d 76, 78–9 (2d Cir. 1944); *United States v. Ebeling*, 146 F.2d 254, 256–7 (2d Cir. 1944).

■ The second threshold observation is that Hiss's counsel did not ask the government at either trial for statements Chambers had made *after* August 3, 1948, which was the date Chambers had first testified publicly before HUAC. On the first trial, Hiss's counsel specifically asked only for Grand jury minutes; the notes of what this witness said the FBI agents took you two F.B.I. reports. They are not statements. One is dated May 14, 1942, and the other June 26, 1945, and again I repeat that even if you do find something in there by an agent which appears to be inconsistent, that then you cannot even give it to the defendant's counsel because there again is the same recording made by an individual, not the witness, and under no theory of law can a witness be accountable for what somebody else has put on paper, . . . .

**33.** The term "statement" is defined by the Jencks Act as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**34.** The *Jencks* rule is one of evidence and procedure only, not one of constitutional dimension. There is therefore no requirement of retroactive application. *United States v. Gandia*, 255 F.2d 454 (2d Cir. 1958).

when he questioned him in 1943, and the statement in 1945 which he said he did not sign . . . .

Hiss's counsel at the first trial restricted himself to this notwithstanding the fact that Chambers had already testified that he gave the FBI *three* statements in December, 1948, and the prosecutor had also stated:

I have different statements that this man gave.[35]

On the second trial Hiss's counsel again asked only for

all other reports of the FBI up to August 3, 1948 . . . .

Thus on both trials Hiss was looking for Chambers's statements *prior* to his first appearance at HUAC. His concentration on these statements is not surprising in view of the fact that 1) Hiss already had all of Chambers's extensive testimony before HUAC in the summer of 1948, 2) Hiss had Chambers's testimony which his own lawyers had taken in the Baltimore action both before and after the indictment on December 15, 1948, and 3) Hiss had Chambers's grand jury testimony of November and December, 1948. Given the state of the law at the time of the trials and Hiss's request only for statements made prior to August 3, 1948, Hiss may not now fault the prosecutor for failing to turn over either the 184-page unsigned 1949 statement or the handwritten statement delivered to the FBI in February, 1949.

### A. The 184-Page Statement

■ As stated above, between January 3 and April 18, 1949, the FBI conducted a number of interviews with Chambers. The notes of these interviews were then edited by the FBI into a first-person 184-page statement that Chambers apparently reviewed to some extent but never signed— the Bureau thereby taking advantage of the *Krulewitch* rule, *supra,* to avoid possible "complications". The document recounts Hiss's payment of Communist Party dues through Chambers, the Chamberses' rent-

free use of the Hiss apartment on Twenty-eighth Street, N.W., in Washington, Alger Hiss's gift of a Ford automobile to the "open Communist Party", Chambers's receipt of Nye Committee documents from Hiss, and Hiss's receipt of an oriental rug from Bykov as a gift from the Russian people. Most importantly, it describes in detail Hiss's transmission of State Department documents to Chambers for photographing and dates Chambers's break with the Communist Party as April, 1938.

Hiss now claims that the information contained in the document would have enabled him to "decimate" the government's case. First, Hiss claims that in the 184-page document Chambers recalled that Hiss had loaned him $500 to purchase a car. Chambers later testified, however, that the amount of the loan was $400. *See* p. 985, *supra.* Not only do I regard the difference between $400 and $500 as modest but other evidence indicates that Chamber's trial recollection was in fact the correct one. Hiss's bank's records showed the withdrawal to be $400, and Chambers's car dealer's records corroborate that amount. I fail to see how the recollection of $500 at the time of the 184-page statement could have had even a minimal impact on the jury. I regard the inconsistency as minor in the extreme.

A second alleged inconsistency which Hiss discovers in the 184-page statement upon close scrutiny does not in fact exist. The alleged conflict is asserted by Hiss's juxtaposing a quotation from Chambers's cross examination on the second trial

Q. Did you mention [Julian Wadleigh] to the FBI?

A. I did not, I believe.

—with the fact that Wadleigh is mentioned thirteen times in the 1949 statement to the FBI. Hiss further asserts this claimed conflict as a reason "the prosecutors decided it was imperative to conceal the existence of the statement from the defense." Hiss, however, has clearly taken the trial quotation out of context, for in context it is clear that Hiss's counsel *on the trial* was ques-

---

**35.** Hiss's counsel did not further explore these on either trial, and this statement alone disposes of any claim that the prosecutor was suppressing any statements.

tioning Chambers about whether he had told the FBI about Wadleigh *prior* to August 3, 1948, *not afterwards.*[36]

Other claims of allegedly valuable impeaching material in the 1949 statement are of matter so minimal, if not specious, as hardly to require comment. Chambers's "prior inconsistent statement to [one Hedwig] Lore", as Hiss's memorandum labels it, turns out to be a statement to the FBI *by Lore* which Chambers denied when the FBI asked him about it.[37]

Finally, Chambers, in the course of telling the FBI that one William Crane did photographic work as part of the espionage operation, is quoted as saying:

I have been told that WILLIAM EDWARD CRANE, who [sic] I knew as PETE and KEITH, has stated that he did photographic work for me *in an apartment in Baltimore.* The description he has given of this apartment and its location, I have also been told, make it rather definite that he is referring to the SPEIGEL apartment, concerning which I have spoken above. In this connection I would like to state that I have absolutely no independent recollection of CRANE having been in this apartment or having done photographic work there. In fact, it is only because of his ability to describe the apartment and its location that I can believe that he was ever there. I have also been informed that CRANE once lived in Baltimore, at which time he was supposedly working with me. This information likewise is new to me because the only places I can recall CRANE having lived are here in Washington and New York. (emphasis supplied).

Thereafter at the first trial Chambers testified:

Q. And where would you photograph them?

A. The documents were photographed in Baltimore at the apartment of Mr. Spiegel.

Q. And when you did not photograph them you said someone else did. Who was the someone else?

A. In the first instance it was Mr. William Crane, whose pseudonym was Keith.

and at the second trial he testified:

Q. And you say you had other people who did photographic work for you?

A. There were two others who did photographic work.

Q. Who were they?

A. One was William Crane whose pseudonym was Keith or Pete, and one was David Carpenter.

The alleged inconsistency is insignificant.[38]

### B. *The 1946 FBI Report*

The March, 1946 FBI report, while not a "statement," fell within the time period of Hiss's request. Nevertheless, the only relevant material it contained was the FBI's recital that Chambers had told the FBI in 1946 that he had left the Communist party in 1937.

Chambers had, however, made the very same statement on numerous other occasions prior to August 3, 1948. He had told this to the FBI twice and once under oath

---

**36.** The cross examination, which fills twelve pages of the printed record, culminates in the following question and answer:

Q. At no time up to August 3, 1948, had you ever mentioned to the FBI the name Julian Wadleigh?

A. That may be true.

**37.** The report reads as follows:

According to LORE, [whom Chambers understood to be also connected with the Soviet apparatus] I had contact with two girls who were private secretaries to Assistant Secretaries of State and with a girl who was employed in a secretarial capacity for one of the high officials of the Department of Com-

merce; that from these secretaries I obtained copies of letters and confidential correspondence. I can only make the categorical statement that this is not true.

**38.** Hiss now claims that if he had had the 1949 statement he would have "learned" of this witness. *Yet he knew of this witness from the first trial.* *See* the quotation from the first trial earlier on this page. In addition, it is not apparent why Hiss would want to "learn" of this witness when Hiss took the position that Chambers *was* having documents photographed that had been purloined, but by others.

to HUAC. All this was known to and extensively developed on cross examination by Hiss's counsel on the trial culminating in the following question and answer:

Q. And isn't it fair to say that every statement you made up to [August 3, 1948] as to when you left the Party you had given the date 1937?

A. I think it is probable.

Against this background, the unproduced March, 1946 FBI report was therefore merely cumulative, and even assuming it

had been a signed statement, the failure to turn it over caused no prejudice to Hiss.[39]

C. *The Handwritten Note*

Chambers's handwritten statement relating to his homosexuality[40] was not only written but also delivered to the government subsequent to the August 3, 1948 cutoff date of Hiss's request at trial.[41] In addition, its now claimed possible use would have had but peripheral value with little likelihood of admissibility.[42]

---

**39.** Hiss also calls to the Court's attention the fact that in the 1946 FBI report Chambers is reported as saying

that as a matter of fact he has absolutely no information that would conclusively· prove that HISS held a membership card in the Communist Party or that he was an actual dues paying member of the Communist Party even while he was active prior to 1937.

From this Hiss contends that "Chambers confesses that his entire testimony is unsupported by even a scrap of actual evidence." This patent *non sequitur* overlooks not only the documentary evidence, *see* p. 981 and n. 12, *supra*, but also disregards the context of the very report itself in which Chambers necessarily reaffirms, in the course of reciting his efforts to get Hiss to quit .the party, his earlier statement to the FBI that Hiss was a member of the Communist Party. The report in that regard reads as follows:

When he was asked whether or not he believed that HISS might have broken with the Communist Party, he stated he had no reason to believe that he may have dropped out, and as a reason for this belief, explained that after he had broken with the Communist Party, he had made a special trip to HISS'[S] home in Georgetown, Washington, D. C. with the purpose of talking HISS into breaking away from the Party. CHAMBERS explained that when he arrived that HISS'[S] wife PRISCILLA was the only one there, and while CHAMBERS momentarily excused himself to go to the bathroom, he observed Mrs. HISS immediately go to the telephone obviously to get in touch with Party members. CHAMBERS immediately returned to the room and awaited the arrival of ALGER HISS.·

When HISS arrived, they had dinner together at his home and then talked with him all night long in an effort to persuade him to leave the Party. He stated that with tears streaming down his face, HISS had refused to break with the Communist Party and had given as his reason for not breaking his loyalty to his friends and principles. CHAMBERS stated his reason in going to HISS in order to get him to break away from the Communist

Party was that he personally thought an awful lot about HISS and considered him an intelligent and decent young man whose better judgment should have led him to break with the Communist movement. CHAMBERS pointed out in his opinion, one of the strongest reasons for HISS maintaining contact with the Communist Party was the fanatical loyalty to the Communist Party on the part of his wife.

**40.** That Hiss knew of Chambers's homosexuality long before trial is clear from two of the documents Hiss himself put before the Court on this motion. The first, McLean's "Outline of Investigation" dated December 28, 1948, *see* n. 31, *supra*, lists as an item to be pursued, "Further evidence of [Chambers's] homosexuality", and the second, McLean's memorandum of January 21, 1949 speaks of a possible "police record of Chambers' [sic] arrest for homosexuality. Further, it appears that one Ida Dailes had told Schmahl that she had left Chambers "because [he] was a homosexual." Schmahl told this to a possible defense witness that he was interviewing, a woman named Lumpkin, with whom he pursued this topic. Lumpkin then told it to the FBI when interviewed by the Bureau.

**41.** The statement contains the following:

Alger Hiss's defense obviously intends to press the charge that I have had homosexual relations with certain individuals. With the resumption of pre-trial deposition it is necessary to face this.

**42.** According to a footnote in the government's reply brief, Allen Weinstein, the author of *Perjury*, dealing with the Hiss case, having had complete access to the Hiss defense files in doing his research, states that Hiss considered putting on proof of Chambers's homosexuality but decided not to do so out of fear of suggesting Hiss's involvement in a homosexual relationship with Chambers or damaging the reputation of Timothy Hobson, Hiss's stepson, an admitted homosexual. I give this no consideration on this motion since it is not before me in

Hiss now claims that the jury should have been informed of Chambers's homosexuality "not on the issue of homosexuality *per se*, but on the self-torture and admitted mental instability which his sexual feelings caused him." First, it should be noted, the statement does not suggest mental instability, and second, to the extent that Chambers was obsessive and had an admitted obsession with Communism, this was fully explored on cross examination at the trial.[43] Moreover, any homosexual relationship Chambers may have had—and in the statement he denies having had such with anyone in the Party—would, in my view, have had little if any relevance to the foregoing. Further, given the reasoning of such authorities as *United States v. Provoo*, 215 F.2d 531 (2d Cir. 1954) and *United States v. Nuccio*, 373 F.2d 168 (2d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), it is most unlikely that Chambers's homosexuality could have been injected into the trial as a general attack on Chambers's character.[44]

 Finally, while not raised in his memorandum, Hiss's counsel contended on oral argument that the prosecutor, having Chambers's statement as to his homosexual-

ity in his files, improperly cross examined the two psychiatrists called by the defense to give as their conclusion that Chambers was a "psychopathic personality" with a tendency to "false accusing". This conclusion of each of the psychiatrists was based on the assumed facts recited in a hypothetical question posed by defense counsel detailing Chambers's life that runs to twenty-four pages in the printed record. Dr. Carl A. L. Binger, the first, was thereafter asked on direct examination:

> Q. Will you tell us, Dr. Binger, what some of the symptoms of a psychopathic personality are?
>
> A. Well, they are quite variegated. They include chronic, persistent and repetitive lying; they include stealing; they include acts of deception and misrepresentation; they include alcoholism and drug addiction; abnormal sexuality; vagabondage; panhandling; inability to form stable attachments, and a tendency to make false accusations.

The first of Hiss's attacks is to the following question on cross examination:

> Q. Now, Doctor, when you started to describe the different symptoms of a per-

---

affidavit form, but I am constrained to note that if true, it might explain why Hiss, notwithstanding receipt of many thousands of government documents under the Freedom of Information Act, and at first agreeing to make his files available to the government on this motion, changed his mind and declined to do so, thus depriving the government—and the Court—of possible additional light on the many subjects treated on this petition.

**43.** Among other things, Chambers was asked:
Q. On August 25, 1948, were you asked these questions and did you give these answers before the House Committee—...
Mr. NIXON: Yes, I mean, do you—is there any grudge that you have against Mr. Hiss over anything that he had done to you?
Mr. CHAMBERS: The story has spread that in testifying against Mr. Hiss I am working out some old grudge or motives of revenge or hatred. I do not hate Mr. Hiss. We were close friends but we were caught in the tragedy of history. Mr. Hiss represents the concealed enemy against which we are all fighting and I am fighting. I have testified against him with remorse and pity but in the moment of history in which the nation now

stands, so help me God, I could not do otherwise.
[Q.] Did you so testify on August 25, 1948?
A. I did.
&ast; &ast; &ast; &ast; &ast; &ast;
Q. After the first trial on either July 8 or July 9, 1949, did you make a statement to a reporter of the New York World Telegram to the effect that "I am very reluctantly and grudgingly step by step destroying myself so that this nation and the faith by which it lives may continue to exist"?
A. I did.

**44.** Hiss now also seeks to legitimize this inflammatory evidence by suggesting that it was material to the testimony of Dr. Carl A. L. Binger, a defense psychiatrist. The purpose of that testimony was to demonstrate that Chambers was a pathological liar—in other words, to impeach Chambers's credibility. If evidence of Chambers's homosexuality was (as one must all but concede) inadmissible to demonstrate directly that Chambers was a liar, then it hardly becomes admissible as the basis of an "expert" opinion that Chambers was a liar.

son with a psychopathic personality you ran through 12 or so, and you said chronic, persistent and repetitive lying; stealing, deception; alcholism [sic] and drug addiction; abnormal sexuality; vagabondage; panhandling. For our purposes, Doctor, we can eliminate immediately three of those, can't we—drug addiction, alcholism [sic] and sexual abnormality? *There is nothing in the hypothetical question that you have that even touches on any of those?*

A. That is right. (emphasis supplied.)

This question, however, I deem not improper inasmuch as it inquired only as to those factors which the doctor had *considered* in rendering his opinion.[45]

On the other hand, the second psychiatrist, Dr. Henry A. Murray, who testified similarly, was questioned differently on cross examination:

Q. And you have no *evidence* here, have you, Doctor, of drug addiction or alcoholism or sexual abnormality, *we have ruled those out, haven't we?*

A. We have ruled out drug addiction and alcoholism. (emphasis supplied.)

Given the existence of Chamber's handwritten statement in the prosecution files, this question, in my judgment, was improper. Hiss's counsel on this motion, however, did not argue that the outcome of the trial in any way hinged on this question and answer,[46] and I do not view it as having affected the verdict in the slightest.

▮ Finally, Hiss contends that the prosecutor had a duty to furnish all three of these "statements" to him as *Brady* material. Even assuming that the basic principle of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), existed in 1949

and 1950, having been foreshadowed by *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1934),[47] I do not see how these materials could have been considered "favorable" or "exculpatory" to Hiss. The 1946 FBI report and the handwritten statement certainly are not, and the 184-page statement of 1949 contains nothing but information damaging in the extreme. *See* p. 990, *supra.* Nothing contained in these three documents suggests that the prosecution in fact used perjured testimony—let alone *knowingly* used such testimony—nor is there any evidence of deliberate concealment as to any of them. Finally, in light of the applicable law, I conclude that they are not "material" in the constitutional sense.[48] They certainly do not "create[ ] a reasonable doubt that did not otherwise exist . . . ." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). There was, therefore, no duty in 1949 and 1950 to turn these over to defense counsel under any equivalent of the theory thereafter articulated in *Brady.*

The ultimate conclusion as to these three "statements" is, therefore, that two of them were *not* statements as defined in 1950; two of them, including the one *that was* a statement, were not within the time frame for which defense counsel sought statements; and even if all three *were* statements and *had been* asked for, there was no prejudice to Hiss from not having them for use on the second trial.

### THE TYPEWRITER

▮ Hiss next claims that he was "deprived . . . of a fair trial" because as to the Woodstock typewriter which he himself traced, bought, and put in evidence as "his"

---

45. The fact of homosexuality could have been included in the hypothetical had Hiss wanted to establish the fact on the cross examination of Chambers or otherwise, for Hiss was certainly sufficiently aware of the fact to have had a good faith basis for questioning Chambers about it.

46. Indeed, counsel stated, "I would be the last one to argue that homosexuality has anything at all to do with credibility."

47. *See Shuler v. Wainwright,* 491 F.2d 1213, 1220 (5th Cir. 1974).

48. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976).

typewriter, "the FBI knew that it was impossible that this could be the correct machine as its serial number was much too high." [49]

It should be recalled that when, at Hiss's demand, Chambers produced—unexpectedly, one gathers—the documents which turned out to have been typed on Hiss's typewriter, both the government and Hiss began an intensive search for the machine and cooperated with each other to that end.[50] *See* p. 982, *supra*. The machine in question, originally purchased by Mrs. Hiss's father, Thomas Fansler, for his insurance partnership with one Henry L. Martin in the later 1920's, was given by Fansler to Mrs. Hiss in the early 1930's and one way or another left the Hisses' home in the later 1930's. *See* n. 13 and pp. 981–982, *supra*.

The Woodstock typewriter that was put in evidence on the trial by Hiss as Exhibit UUU was located by Hiss's investigators only after a great expenditure of time and effort. A number of witnesses were called by Hiss at the trial to testify to the machine's travels after Mrs. Hiss had given it away. According to them it first passed to the children of the Hisses' housekeeper, Claudia Catlett. Her son, Perry Catlett, transferred the machine to his sister, Burnetta, who in turn relinquished it to one Dr. Easter. Following Easter's death, his neighbor Vernon Marlow obtained the typewriter. Junkman Ira Lockey took the machine from Marlow and gave it to his daughter, one Mrs. McQueen, who later returned it to her father from whom defense attorney McLean purchased it. *See* n. 16 *supra*. In addition, Hiss and his wife *both* testified that the machine he placed in evidence had been their machine. And Hiss did not dispute on the trial that that very machine had typed not only the "standards" he had originally furnished the FBI but also all but one of the forty-four typewritten documents that Chambers had produced in Baltimore. *See* n. 11, *supra*.

Hiss's present contention in the face of all this proof of his own is that the FBI *knew* from its investigation that Exhibit UUU could not have been the machine that Mrs. Hiss had gotten from her father because the serial number established that the machine had been manufactured in 1929, and Fansler had purchased the machine in 1927. The prosecutor therefore had a duty to tell Hiss of this, he now contends.

There are two dispositive answers to this contention. The first is that the FBI reports of the investigation on this question are highly contradictory and far from conclusive. For example, while Thomas Grady, the Woodstock salesman who made the sale to Fansler, said he sold no typewriters after he quit his job at Woodstock in 1927, he remembered selling the machine to the Fansler agency during the time one Anne Coyle was employed by Fansler as a secretary. Anne Coyle, however, did not begin working for Fansler until the fall of 1928. Martin's impression, too, was that the Woodstock had been purchased *after* Anne Coyle had come to work. An earlier secretary, one Katherine Shotwell, recalled a Woodstock that might have been "traded in for a new one during twenty-seven or twenty-eight" according to an FBI interview. The proposed, but unsigned, affidavit of Joseph Schmitt, factory manager in charge of the Woodstock records, submitted as part of Hiss's motion for a new trial in 1952 similarly does not definitively establish 1929 as the date the typewriter, Exhibit UUU,

---

**49.** Its serial number was 230,099 which, Hiss claims, fixed the date of its manufacture as 1929, two years after that of the machine he and Mrs. Hiss had had.

**50.** It is appropriate again to note in this connection, that it was Hiss—who incorrectly paints himself as disadvantaged in his preparation—who found the Woodstock, notwithstanding his attribution to the FBI of "access to sources of information and resources beyond the wildest dreams of the defense." Nor does Hiss endeavor to explain how a typewriter with characteristics *identical* to those possessed by the Hiss machine could have been placed with the Catletts and their associates, there to be "found" by his investigators. *See* Judge Goddard's comments made in denying the motion for a new trial in *United States v. Hiss*, 107 F.Supp. 128, 134 (S.D.N.Y.1952), *aff'd*, 201 F.2d 372 (2d Cir.), *cert. denied*, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953).

was manufactured. The affidavit had been prepared by Hiss's then-counsel and sent to Schmitt for signature. Schmitt returned it unsigned, later telling the FBI that "he drew no conclusion in last paragraph of exhibit. No records available re exact system of skipping serial numbers.... [N]o assurance this number is official [sic]." [51]

In any event, the second dispositive answer is that this issue is wholly peripheral to the matter that was on trial. While it appears likely that the prosecution did not wish to venture upon this sea of confusion with the jury, it is quite clear that such a venture was neither necessary nor required by considerations of fairness in view of Hiss's concession made long before trial that *regardless of the typewriter he had produced at trial, the same typewriter had typed both the "standards" and all but one of Chambers's Baltimore documents.* The conclusion is thus inescapable that while the evidence relating to the machine's origins is puzzling, and undoubtedly the product of confused memories, nevertheless, a Woodstock *had* come to the Hisses' home in the 1930's and *had* concededly typed both the Baltimore documents and the Hiss "standards". Consequently, any evidence as to its origins was irrelevant, and the prosecutor was under no duty to disclose to Hiss the multi-faceted gleanings of the government's investigation into this area.

■ Finally on this subject, I note that this entire issue was the subject of Hiss's 1952 motion for a new trial on virtually the same evidence and that this is therefore a relitigation by Hiss of a matter already decided adversely to him. Judge Goddard, in his opinion at that time, *United States v. Hiss*, 107 F.Supp. 128, 134 (S.D.N.Y.1952), *aff'd on opinion below*, 201 F.2d 372 (2d Cir.), *cert. denied*, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953), stated:

> The defense reasoning that No. 230,099 was manufactured after the Hiss machine

is not sustained by any proof. Their theory is based wholly upon incomplete records from which they have drawn speculations from approximate dates of manufacture. Some of their own witnesses cannot support their theory.

I also note that the 1952 motion for a new trial was predicated, in part, upon Hiss's hypothesis that Chambers had committed forgery by typewriter by constructing Woodstock 230,099 with the identical typeface characteristics as the Hiss machine—without access to the Hiss "standards" to guide him—and thereafter typing the "Baltimore documents" thereon to extricate himself from Hiss's libel action. As Judge Goddard pointed out, however:

> If this be so, it would mean that he [Chambers] constructed in three months a machine that has taken the defense's several experts at least one year to produce and that still falls short of being a perfect duplication. Moreover, there is not a trace of any evidence that Chambers had the mechanical skill, tools, equipment or material for such a difficult task. It is quite unlikely that Communist friends constructed it or provided the material, etc. for Chambers, as the defense suggests, because at that time his relationship with them was far from friendly. If Chambers had constructed a duplicate machine how would he have known where to plant it so that it would be found by Hiss? In planting a duplicate typewriter he would subject himself to the risk of the real Hiss machine being found and his entire case being destroyed.

## THE PROSECUTION'S ALLEGED KNOWING USE OF PERJURED TESTIMONY FROM WITNESSES MURRAY AND ROULHAC

■ Hiss next contends that the prosecution knowingly used perjured testimony from government rebuttal witnesses Edith

---

**51.** It would seem axiomatic that in this context, if a defendant puts a typewriter in evidence and he and his wife state under oath that that was

Murray and George Roulhac. These claims I find to be frivolous.[52]

Edith Murray, as mentioned earlier, *see* pp. 985–986, *supra*, worked as the Chamberses' maid in the latter part of 1935 and the spring of 1936. She testified that during this time period the Chamberses, whom she knew as the "Cantwells", had only two visitors. She identified them at the trial as Mr. and Mrs. Hiss. She knew Mrs. Hiss as Miss Priscilla. It does not appear that she knew Mr. Hiss by any name at the time. Based upon a signed statement that she gave to the FBI reciting, *inter alia*, that during her examination of photographs of Mr. and Mrs. Hiss she was told their names, Hiss now claims that she committed perjury when she testified that she was not told the names of the Hisses prior to coming to New York for the trial. Far from showing the government's knowing use of perjury, the facts demonstrate no more than a prior inconsistent statement by the witness.

Mrs. Murray, a domestic, in poor health, and not a newspaper reader was basically unaware of the Hiss controversy[53] until she was brought to New York for the trial. In these circumstances, it is hardly surprising that at trial she did not remember that the agents had mentioned the unfamiliar name "Hiss" at the time she viewed the photographs some three months earlier. Moreover, given her unfamiliarity with the case, mention of the name "Hiss" could have had no conceivable prejudicial or suggestive effect on her identification. While Hiss's counsel might have explored this on cross examination to attack her recollection, it hardly seems something that would have cast any serious doubt on the basic truthfulness of Mrs. Murray's testimony identifying the Hisses.[54]

Hiss next alleges that rebuttal witness George Roulhac committed two acts of perjury. Roulhac, then a sergeant in the United States Air Corps stationed in Alaska, testified on January 16, 1950. He stated that the first time he had observed a typewriter like the Woodstock in the home of the Hisses' former maid, Claudia Catlett, was three months after January 17, 1938, the date he and the Catletts moved into a new residence at 2728 P Street. This testimony was obviously offered to rebut Hiss's claim that the typewriter had been given to Mrs. Catlett prior to 1938.

Hiss's first claim of perjury as to Roulhac is addressed to Roulhac's statement on cross examination that he, Roulhac, had only been present approximately three or four times in the United States Courthouse prior to trial. Hiss claims that Roulhac had in fact been there some twenty times. He bases this on a letter of December 13, 1949, addressed to the United States Marshal's office. That letter, over the prosecutor's signature, states, "With reference to ... Sgt. George N. Roulhac, Jr., ... and the payment to him of either witness fees or necessary subsistence, please be advised that ... I, together with other Agents, saw the Sergeant daily [for the month of November]." Hiss's claim of perjury by Roulhac on this collateral issue flies in the face of common sense. Roulhac's testimony of four visits to the courthouse accords not only with what one would expect given the relatively straightforward and simple nature of his testimony, but the chief prosecutor, with the second trial commencing in mid-November, obviously had more pressing matters to occupy his time than to meet daily with Sergeant Roulhac. The prosecutor's letter, clearly for another purpose and, as far as the record reflects, never shown to

their typewriter, the prosecutor is entitled to accept this as so.

**52.** I note that Hiss apparently made no effort to locate, interview, and get affidavits from either Murray or Roulhac—assuming they are still living—prior to leveling these serious charges.

**53.** Mrs. Murray had heard "something about some filling [sic] was found in a pumpkin on a

farm in Westminster, but I still didn't pay any attention to that."

**54.** I note that although Hiss's counsel established on cross examination in customary fashion, *see* p. 989, *supra*, that Mrs. Murray had signed a statement, he made no request of the Court to inspect it for possible inconsistencies.

Roulhac, does not therefore support the claim that the Government knowingly allowed perjured testimony by Roulhac at trial.

Hiss's second contention as to Roulhac is stated as follows:

> The change in Roulhac's testimony over the period of his contact with the FBI and prosecution reveals further perjury which was committed by this witness.

The answer to this claim is that there was no change in any "testimony". What does appear is that when Roulhac was first interviewed by the FBI in Alaska as to a typewriter at the Catlett's eleven years earlier, Roulhac—for whom this could hardly have been a significant matter—did not recall seeing a typewriter after he first moved to P Street. He did recall seeing much later a "portable model in a black case." According to the FBI he was also at that time "very vague as to dates and events."

When later brought to New York and shown numerous documents, including photographs of apartments and the P Street lease with his name on it, his recollection was substantially refreshed, as one might expect, particularly as to the date of the move to P Street. Most significant of all, an FBI report reveals that upon being shown photographs of seven different typewriters, Roulhac "without hesitation" picked out the Woodstock as looking like the one the Catletts had received from the Hisses. Hiss's claim of "further perjury" by Roulhac, therefore, is utterly without support. It is, needless to say, entirely proper for a prosecutor—or any lawyer—to refresh a witness's recollection of events if the lawyer believes it to be faulty. There is no showing that anything more than that happened here.

### THE PROSECUTION'S SUMMATION ON CERTAIN COMMON TYPING ERRORS

Hiss finally claims that the prosecutor improperly referred in his summation to certain common typing errors found in both the Baltimore exhibits and two of the Hiss standards. The challenged statement—eleven lines of the forty-nine page printed summation—is as follows:

> Now in connection with the documents I am going to give you two little thoughts to take with you. In going over the documents I noticed some common typing errors. When you get these documents inside, these Baltimore documents and the standards, you know the Mercy letter and the Timmy Hobson thing, look for similarity of mistakes, and I call to your attention the following combinations 'r' for 'i', 'f' for 'g', 'f' for 'd' and you will see them. You will see the same mistakes on the standards, on the Mercy Hospital letter and on the Timmy Hobson letter, the same characteristics as you do on the Baltimore exhibits.

Given Hiss's counsel's earlier suggestion to the jury in summation that Chambers or a confederate—and not one of the Hisses—typed the Baltimore documents on Hiss's machine *after* surreptitiously locating it at the maid's home, it was certainly appropriate for the prosecution to call to the jury's attention a small piece of evidence of some repetitive mental or muscular typing quirk supporting the conclusion that *whoever* had typed the two standards and the Baltimore exhibits,[55] they were all typed by one person with that quirk. *United States ex rel. Coleman v. Mancusi*, 423 F.2d 985, 987–8, (2d Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970). In fact, the common typing errors flowing from two *different* standards had been called to the prosecutor's attention by one of the jurors at the first trial. As an FBI memorandum of July 21, 1949, reveals,

> These facts were [thereafter] pointed out to the Bureau [by the prosecutor] with the hope that possibly a sufficient

---

**55.** Hiss's contention that the prosecutor was motivated by the awareness that the *"identity of the typist* [as Priscilla Hiss] was seen as vital to the prosecution" is wholly erroneous. Judge Goddard, who presided over the second trial, specifically found in denying the motion for a new trial in 1952 that Mrs. Hiss's role as the alleged typist was "not an essential element of the case against Hiss." *United States v. Hiss, supra*, 107 F.Supp. at 133.

number of these errors could be found in the known specimens and questioned documents that would enable someone to so testify. These examinations were made by the Laboratory and a report was submitted, indicating that it would be impossible for an expert to testify to the fact that because of the similar or common errors it followed that PRISCILLA HISS actually typed the questioned documents. Hiss now faults the prosecutor for making the challenged remarks in view of the conclusion in this FBI laboratory report. However, the fact that an expert had not been willing to testify that the typist of all the documents was Priscilla Hiss does not mean that the conclusion implicit in the prosecutor's comment—that whatever his or her identity, the same person typed all the documents—was not valid, given the observable, unique typing errors common to the various documents.

Finally, even assuming *arguendo* that the prosecutor should not have referred to the common typing errors, his comments "do not possess the constitutional dimension necessary for review by this Court," *Klein v. Smith*, 383 F.Supp. 485, 487 (S.D.N.Y. 1974), *aff'd*, 559 F.2d 189 (2d Cir.), *cert. denied*, 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977), particularly where as here, they are raised by petition for a writ of *coram nobis*.

## CONCLUSION

An analysis of Hiss's claim of an intrusion into the defense camp, reveals no prejudice to him. *Weatherford v. Bursey, supra*. Hiss's remaining claims must be viewed under the reasonable doubt standard. *United States v. Morgan, supra*. Whether these claims are considered singly or together, they raise no real question whatsoever, let alone a reasonable doubt, as to Hiss's guilt. The trial was a fair one by any standard, and I am presented with nothing requiring a hearing on any issue. The jury verdict rendered in 1950 was amply supported by the evidence—the most damaging aspects of which were admitted by Hiss—and nothing presented in these papers, extensive though they are, places that verdict under any cloud. Accordingly, Hiss's petition for a writ of error *coram nobis* is dismissed.

So ordered.